615 A.2d 1

COMMONWEALTH of Pennsylvania, Appellee,

v.

Robert Peter ZOOK, Jr., Appellant.

Supreme Court of Pennsylvania.

Argued Oct. 24, 1991.

Decided June 17, 1992.

James P. Cullen, Vincent J. Quinn, Lancaster, for appellant.

Henry S. Kenderdine, Jr., Dist. Atty., Joseph C. Madenspacher, First Asst. Dist. Atty., Robert A. Graci, Chief Deputy Atty. Gen., Roseann B. Termini, Harrisburg, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION

McDERMOTT, Justice.

On January 3, 1990, the jury trial of Robert Peter Zook, Jr., commenced in the Court of Common Pleas of Lancaster County before the Honorable Louis J. Farina in connection with the July 24, 1985 brutal slaying of Paul Conrad and Sandra Wiker. The jury found appellant guilty of two counts of first degree murder and sentenced him to death on both counts. This was appellant's second trial on these charges. In appellant's first trial the jury returned guilty verdicts and sentenced appellant to death on both counts; however, these verdicts and concomitant sentences were reversed by this

Court and appellant was awarded a new trial.[1] Appellant's appeal from his second trial is now before us on automatic review pursuant to 42 Pa.C.S. § 9711(h)(1).

Although appellant does not challenge the sufficiency of the evidence, it is the obligation of this Court in cases where the capital sanction is imposed, to independently examine the sufficiency of the evidence supporting an appellant's conviction. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). In reviewing the sufficiency of the evidence, we must determine whether the evidence, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to establish all the elements necessary to sustain a conviction of first degree murder. *Commonwealth v. Strong*, 522 Pa. 445, 563 A.2d 479 (1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1536, 108 L.Ed.2d 775 (1990). With these standards in mind we will review the record in this matter.

On the evening of July 23, 1985, at approximately 7:00 P.M. appellant met with a friend, Allen Ault, at the Little Dutch Cafe, a local bar in the City of Lancaster. At approximately 9:00 P.M. appellant asked another friend, Karen Hanna, to drive him to Sandy Nace's house. The friend obliged and after briefly speaking with Nace, appellant and Nace returned to the bar to meet again with Ault. An hour later appellant left the bar with Nace to visit Marcellus Barnett, at Barnett's apartment.

Marcellus Barnett testified that the late night visit centered around questions concerning a potential robbery and items that might be found in a certain apartment, such as money, guns, and electronic equipment. Barnett drew a diagram for

1. *Commonwealth v. Zook*, 520 Pa. 210, 553 A.2d 920 (1989), *cert. denied*, 493 U.S. 873, 110 S.Ct. 203, 107 L.Ed.2d 156 (1989). In a 4–3 opinion, this Court concluded that appellant's rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), *reh'd denied*, 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981), to secure counsel, were violated and therefore his statements made to police were improperly admitted into evidence. This issue is not before us in this direct appeal.

appellant and Nace to help them familiarize themselves with the layout of the apartment. Thereafter, appellant and the others walked downtown. At this time appellant indicated that the job would not require masks since there was a good possibility that the victims would have to be killed.

Later that evening Barnett discovered from a friend that the proposed victim, Mr. Conrad, did not have a substantial amount of money or weapons at the apartment, and thus he sought to inform appellant that the job was not worth the risk. Unfortunately for the victims this information was never delivered. It was not until the next day that Barnett learned of the murders.

Barnett did not see appellant again until the next evening when he came to Barnett's apartment. Appellant told Barnett that it had been an easy job and gave details of the murders. He also told Barnett that he would be staying at a local motel under the assumed name of James Long. Barnett informed the police of appellant's crimes and his plans, and further told the police that appellant was probably armed. The police set up a surveillance of the motel. Police arrived at the motel at approximately 3:00 A.M. and were instructed not to act unless appellant appeared to be leaving the scene.

The police discovered that appellant had registered at the Parkside Motel on July 25, 1985, under the assumed name of James Long. At approximately 6:25 A.M. on the following day, appellant left his room and walked toward an outside vending machine. The police officers moved in and placed him under arrest. At the time of this arrest appellant had a knife on his belt, a handgun in his boot, and two rings and necklace later identified as belonging to Paul Conrad.

During the trial, the Commonwealth offered the testimony of James Walck, who testified that while in prison together, appellant told him in detail how the victims had been murdered. Police found the victims bound at the hands and feet with tape. Duct tape completely covered their eyes, nose and mouth. Knotted pieces of clothing were discovered in each victims' mouth. Electrical cords were wrapped tightly around their necks. The cause of death for each was strangulation

coupled with multiple stab wounds. In addition, Walck testified that appellant told him that he had anally penetrated Ms. Wiker prior to her death.

Finally, Special Agent Richard Reem of the Federal Bureau of Investigations testified that human blood taken from the boots of appellant matched the blood type of one of the victims. This blood type was inconsistent with appellant's blood type. Moreover, Agent Reem testified that an enzyme analysis performed on the victim's blood established that only 1.9% of the Caucasian population is known to have this frequency of this enzyme. In this case, both the appellant and the victims were Caucasian.

Based on our review of this evidence, we are satisfied that the Commonwealth presented sufficient evidence to sustain the jury's verdicts of guilt on two counts of first degree murder. We now turn to appellant's claims of error.

## PRE-TRIAL ERRORS

■ Appellant's first claim of error concerns the trial court's denial of his motion to quash the information lodged against him. This motion was based on the fact that his preliminary hearing was not held until twenty-seven (27) days after he was first incarcerated on these charges which he contends constituted a violation of Pa.R.Crim.P. 140(d).

Rule 140(d) of the Pennsylvania Rules of Criminal Procedure provides in pertinent part:

(d) Unless the preliminary hearing is waived by a defendant who is represented by counsel, the issuing authority shall:

(1) fix a day and hour for a preliminary hearing which shall not be less than three nor more than ten days after preliminary arraignment unless extended for cause shown, unless the issuing authority fixes an earlier date upon request of the defendant or his attorney with the consent of the complainant and the attorney for the Commonwealth[.]

Pa.R.Crim.P. 140(d)(1).

Appellant argues that the language of this rule is mandatory and therefore he is entitled to a dismissal of the charges,

arrest of judgment and discharge. He further argues that the Commonwealth failed to show sufficient cause to justify holding the hearing outside the ten day period prescribed by the rule.

We first take note of the fact that this claim of error was raised by appellant during his first trial and addressed at that time.[2] During the course of pre-trial proceedings, the trial court heard testimony from the scheduling clerk at the Consolidated District Justice's office, who testified that appellant's preliminary hearing was originally scheduled within the ten day period but later had to be rescheduled due to a full schedule at the District Justice's office. The court held that this constituted good cause for the hearing to be rescheduled and denied the request for dismissal of the charges. Without commenting on the correctness of this decision we dismiss appellant's claim of error on a more fundamental ground, to wit; that there is no relief to be afforded to appellant at this point.

The courts of this Commonwealth have previously held that the only relief available to a defendant for a violation of Rule 140(d)(1) is to be released from custody until the preliminary hearing is held. *See Commonwealth v. Bernhardt*, 359 Pa.Super. 413, 422, 519 A.2d 417 (1986) ("[w]here a preliminary hearing has not been held within the time required by Pa. R.Crim.P. 140(d)(1) and there has been no good cause shown for continuing the hearing beyond that time, an accused is entitled to be released from custody until the preliminary hearing has been held.")

In *Commonwealth v. Revtai*, 516 Pa. 53, 532 A.2d 1 (1987), this Court held:

[t]he time limits established in our Rules [of Criminal Procedure] *do* require strict compliance, and when such compliance does not exist a defect in procedure has occurred. That defect however then triggers the *separate and distinct* analysis as to what is the proper remedy. As

---

**2.** Because of our disposition of appellant's Fifth Amendment claim, his additional claims were not addressed during the course of his first appeal.

we have previously indicated, when a defect occurs under Chapter 100 the remedy is explicitly provided in Rule 150. *Id.* at 71–2, 532 A.2d at 10 (emphasis in original).

Rule 150 provides as follows:

A defendant shall not be discharged nor shall a case be dismissed because of a defect in the *form or content of a complaint, summons, or warrant,* or a defect in the procedures of this Chapter, unless the defendant raises the defect before the conclusion of the preliminary hearing and the defect is prejudicial to the rights of the defendant.

Pa.R.Crim.P. 150.

As we stated in *Revtai,* this Rule clearly eschews the application of *per se* remedies for technical violations, and demands a showing of prejudice by the defendant before a dismissal of prosecution is warranted. Moreover, such prejudice must be beyond the inherent prejudice of being subjected to a criminal prosecution. Since appellant has failed to demonstrate how he was prejudiced by the delay, and since appellant's time for relief has expired, no relief is available.

■ Appellant next asserts that his warrantless arrest was made without probable cause and was therefore illegal and unconstitutional under the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.

It is axiomatic that in order to make a constitutionally valid warrantless arrest the police must have probable cause. *Commonwealth v. Lovette,* 498 Pa. 665, 450 A.2d 975 (1982), *cert. denied,* 459 U.S. 1178, 103 S.Ct. 830, 74 L.Ed.2d 1025 (1983); *Commonwealth v. Stokes,* 480 Pa. 38, 389 A.2d 74 (1978). A police officer may arrest without a warrant where there is probable cause to believe that a felony has been committed and that the arrestee is the felon. Probable cause exists where the facts and circumstances within the knowledge of the officer are reasonably trustworthy and sufficient to warrant a person of reasonable caution in believing that the arrestee has committed the offense. *Commonwealth v. Travaglia,* 502 Pa. 474, 467 A.2d 288 (1983), *cert. denied,* 467 U.S. 1256, 104 S.Ct.

3547, 82 L.Ed.2d 850 (1984); *Commonwealth v. Jackson,* 450 Pa. 113, 299 A.2d 213 (1973). The facts pertaining to appellant's arrest follow below.

During the evening of July 25, 1985, a detective from the Lancaster Police Department interviewed Marcellus Barnett concerning certain information he possessed regarding the Conrad–Wiker murders. He was questioned at the police station over a period of several hours. Mr. Barnett informed the police of his involvement in providing appellant with a layout diagram of Paul Conrad's apartment and other information possibly linking appellant to the murders. Barnett additionally stated that he believed that appellant was staying at the Parkside Motel under the assumed name of James Long and that he was probably armed. Following this interview the police attempted to corroborate as much of the given information as possible.

Appellant claims that there was insufficient indicia of reliability regarding the statements of Barnett, and consequently the reliance by the police was not justified under constitutional standards. We disagree.

Marcellus Barnett was an in-fact co-conspirator since he participated in the planning of the crime by providing information to appellant, although he was not present at the crime. It is well-settled that the uncorroborated confession of an accomplice which implicates the suspect will supply the probable cause for a warrantless arrest. *Commonwealth v. Johnson,* 467 Pa. 146, 354 A.2d 886 (1976); *Commonwealth v. Rush,* 459 Pa. 23, 326 A.2d 340 (1974). Moreover, even if Barnett is not considered as an accomplice there was evidence to establish his reliability. First, he was a named informant and not an anonymous source. Second, these statements were made against his penal interest in that he admitted to the conspiracy to commit burglary/robbery. *Commonwealth v. Miller,* 497 Pa. 257, 439 A.2d 1167 (1982). Finally, the police were able to verify the facts given to them by Barnett that an individual was registered at the motel under the name of James Long. This corroboration clearly enhanced the reliability of this information.

Therefore, we are convinced that under these circumstances the police had sufficient cause to arrest appellant without a warrant. Furthermore, once appellant was arrested the police were permitted to conduct a pat-down search of his person, and it was this pat-down search that yielded the discovery of a concealed revolver and knife. Thus, these items were properly admitted at trial. In addition, all the items taken from appellant at the time of his booking at the police station, in particular a zodiac charm necklace and two rings later identified as belonging to Mr. Conrad, and an address book, were properly seized as part of an inventory search; thus, they were admissible at trial.

Recently, in *Commonwealth v. Nace*, 524 Pa. 323, 571 A.2d 1389 (1990), *cert. denied*, 498 U.S. 966, 111 S.Ct. 426, 112 L.Ed.2d 411 (1990), this Court addressed the issue of inventory searches. There, we stated that inventory searches are a well-defined exception to the warrant requirement of the Fourth Amendment and are a recognized part of our law:

[I]t is reasonable for police to search the personal effects of a person under lawful arrest as part of the routine administrative procedure at a police station house incident to booking and jailing the suspect. The justification for such searches does not rest on probable cause, and hence the absence of a warrant is immaterial to the reasonableness of the search. Indeed, we have previously established that the inventory search constitutes a well-defined exception to the warrant requirement. *See South Dakota v. Opperman*, [428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976)].

*Id.* 524 Pa. at 327, 571 A.2d at 1392.

In line with this argument, appellant contends that his statement given to police after his arrest denying his involvement in the murders should have been suppressed since the "primary taint" resulting from the illegal arrest had not been purged. Since the arrest in this case was legal there was no valid reason for the trial court to suppress this statement.

■ The last issue raised by appellant concerning his arrest and the subsequent searches pertains to the search which was conducted pursuant to a search warrant. As a result of the search the police seized the following evidence: combings, pluckings and cuttings of appellant's head and pubic hair; samples of material from beneath appellant's fingernails, blood samples; a black T-shirt; a pair of blue jeans; a pair of gray socks and a pair of brown boots.

Appellant attacks this search in several respects. Appellant continues to assert that since his initial arrest was unconstitutional then, therefore, this search was illegal. We have addressed this issue above and concluded that this argument is meritless.

Appellant next maintains that the search warrant was defective in that the application failed to set forth sufficient probable cause. We disagree. The police had Barnett's statement concerning the planning of the robbery and appellant's admission to Barnett of his participation in the crimes. Furthermore, at the time of his arrest appellant had in his possession the two rings and chain which were identified as belonging to the murdered victim, Mr. Conrad. Although appellant continues to attack Mr. Barnett's credibility, that is an issue which goes to Barnett's reliability as an informant, an issue which we have previously addressed. Under the totality of the circumstances, these facts taken together were sufficient to establish the necessary probable cause. *See Commonwealth v. Carlisle,* 517 Pa. 36, 534 A.2d 469 (1987); *Commonwealth v. Gray,* 509 Pa. 476, 503 A.2d 921 (1985).

Appellant next challenges the seizure of the two rings and chain as being the fruit of his unconstitutional arrest. Again, this argument is meritless since we have concluded above that the arrest in this case was legal.

■ Appellant's final pre-trial argument alleges that the trial court erred in failing to grant his motion for a change of venue due to prejudicial pre-trial publicity. The grant or denial of change of venue is a matter within the sound discretion of the trial court, and its exercise will not be

disturbed by an appellate court in the absence of an abuse of that discretion. *Commonwealth v. Buehl,* 510 Pa. 363, 375–76, 508 A.2d 1167, 1173 (1986), *cert. denied,* 488 U.S. 871, 109 S.Ct. 187, 102 L.Ed.2d 156 (1988). In deciding whether pre-trial publicity was such that a new trial is required, the following factors must be considered:

1) whether pre-trial publicity was inherently prejudicial;

2) whether pre-trial publicity saturated the community;

3) whether there was a sufficient proximity in time between the publicity and the selection of a jury such that the community from which the jury was drawn did not have an opportunity to 'cool down' from the effect of the publicity, thus making a fair trial in this community impossible. *See Commonwealth v. Romeri,* 504 Pa. 124, 470 A.2d 498 (1983), *cert. denied,* 466 U.S. 942, 104 S.Ct. 1922, 80 L.Ed.2d 469 (1984). *See also Commonwealth v. Breakiron,* 524 Pa. 282, 571 A.2d 1035 (1990), *cert. denied,* 498 U.S. 881, 111 S.Ct. 224, 112 L.Ed.2d 179 (1990).

In reviewing the trial court's decision, the only legitimate inquiry is whether any juror formed a fixed opinion of [the defendant's] guilt or innocence as a result of the pre-trial publicity.

*Commonwealth v. Kichline,* 468 Pa. 265, 274, 361 A.2d 282, 287 (1976).

Normally, one who claims that he has been denied a fair trial because of prejudicial pre-trial publicity must show actual prejudice in the impaneling of the jury ... But this rule is subject to an important exception. In certain cases there 'can be pretrial publicity so sustained, so pervasive, so inflammatory, and so inculpatory as to demand a change of venue without putting the defendant to any burden of establishing a nexus between the publicity and actual prejudice,' ... because the circumstances make it apparent that there is a substantial likelihood that a fair trial cannot be had.

*Commonwealth v. Holcomb,* 508 Pa. 425, 443, 498 A.2d 833, 842 (1985), *cert. denied,* 475 U.S. 1150, 106 S.Ct. 1804, 90 L.Ed.2d 349 (1986), citing *Romeri, supra.*

A review of the publicity in the instant case reveals that the trial court did not abuse its discretion in denying the motion. The news reporting in this case was primarily factual and objective; it was neither sensational nor inflammatory. The coverage did not reveal the existence of appellant's prior criminal record, or refer to confessions or admissions by appellant; did not discuss the possibility of a guilty plea; did not have any reenactment of the crime; and did not contain inflammatory statements as to the merits of the case. *See Romeri, supra.*

Based on the *voir dire* it was further established that many of the potential jurors had not heard anything about the case; and all of the jurors selected, including those who had some knowledge of the case, stated they had no fixed opinions, could be fair and impartial, and could decide the case solely on the evidence presented at trial. Consequently, under the applicable law cited above, the court's refusal to change the venue was justified.

## TRIAL ERRORS

Regarding this phase of the trial, appellant first contends that it was error for the trial court to overrule his motion for a mistrial after a Commonwealth witness testified that he remembered meeting appellant while in prison. Specifically, during the direct examination of Marcellus Barnett, the Commonwealth asked the following questions:

Q. Okay. How did you go about meeting him [appellant] at your apartment?

Did you go to him, did he come to you or what?

A. I think he was walking down the street and then the girl I was going out with at the time knew him. She pulled him up and we remembered meeting in prison. I used the bathroom of the cell he was in and we both remembered that.

It was like in passing, you know what I mean. He said, I remember you and I said, I remember you. And after that we just started talking about whatever came to mind.

After this exchange and out of the presence of the jury, defense counsel immediately moved for a mistrial. The trial court denied this request for a mistrial and instead elected to give a curative instruction.[3] However, it is appellant's contention that, given the nature of the charges and the pre-trial

3. Following this remark, the trial court conducted an in-camera examination of the witness. The next morning the court gave the following curative instruction:

I have something very important and serious to discuss with you. As you recall, there was a break in the testimony in which counsel and the court then met.

As a result of that break and what had occurred, I am giving you this instruction which I ask you to listen to very carefully and heed and direct that you heed.

Yesterday near the end of the day Marcellus Barnett had just taken the witness stand and under questioning by the District Attorney replied to the District Attorney's question as to how he had come to meet the defendant, Mr. Zook, at his, that is Marcellus Barnett's apartment, on July 23, 1985.

In response to that question Mr. Barnett unresponsively described a meeting he had with Mr. Zook on the street where he recognized that they had a brief prior encounter in prison.

Now, I am paraphrasing and not giving his exact testimony and you will recall it. Counsel for the defendant objected to the testimony—counsel for the defendant objected to that testimony. I have sustained the objection and am instructing you to totally disregard Marcellus Barnett's testimony about meeting Mr. Zook in prison.

That testimony I am directing be stricken from the record as it is totally irrelevant to these proceedings and shall play no role whatsoever in them. You are to totally ignore and disregard that testimony. Strike it from your mind and let it play no role of any kind whatsoever in these proceedings and your deliberations.

I give you this instruction in the strongest and most direct terms. There is no relevant inference to be drawn whatsoever from Mr. Barnett's remark. There are many possible inferences to be drawn from the fact that a person may encounter another in prison, none of which are in any way whatsoever relevant in this case and none of which you should speculate upon.

Disregard the remark completely. Do not think about it, consider or mention it in your deliberations.

I am confident that you can and will follow my instructions just the same as you, during voir dire, promised not to let any prior information you may have about the case play any role in your deliberations.

Do the same with Mr. Barnett's remark. If any member of the jury does not understand my ruling and direction to you to disregard Marcellus Barnett's remark and place it totally out of your mind, please raise your hand and I will try to explain it more clearly.

Good. No one has—let the record reflect no juror has raised their hand. That makes it clear to me that you understand and will comply with my ruling. Thank you.

publicity, the curative instruction given by the trial court was inadequate to cure the prejudice suffered by him.

In *Commonwealth v. Stephen Quintin Morris*, 513 Pa. 169, 519 A.2d 374 (1986), we addressed a similar situation and stated:

> As a general rule, evidence of crimes unrelated to the charge for which the defendant is being tried, is inadmissible ... There is no *per se* rule that requires a new trial for a defendant every time there is a reference to prior criminal activity ... '[W]e have never ascribed to the view that all improper references to prior criminal activities necessarily require the award of a new trial as the only effective remedy.' ... Further, the reference to prior criminal activity must be prejudicial to the defendant, with prejudice resulting 'where the testimony conveys to the jury, either expressly or by reasonable implication, the fact of a prior criminal offense.'
>
> However, it is possible to eradicate any possible prejudice resulting from reference to prior criminal activity by the defendant.... An immediate curative instruction to the jury may alleviate any harm to the defendant that results from reference to prior criminal conduct.

*Id.* at 175–76, 519 A.2d at 376–77 (citations omitted). *See Commonwealth v. Kelvin Morris*, 522 Pa. 533, 564 A.2d 1226 (1989).

In determining whether a reference to prior criminal activity requires the granting of a new trial, we must analyze each case individually for prejudice. Instantly, it is clear from the transcript that this remark was not elicited intentionally by the Commonwealth. In fact, the record reveals that this witness was specifically directed by the Commonwealth before taking the stand not to make any reference of this kind. Moreover, the witness' answer was unresponsive to the question since the Commonwealth sought to establish how the witness met appellant at his apartment on the night of the murder. In addition, the answer received did not make a specific reference explaining why appellant was in prison. The Commonwealth also did not attempt to take advantage of

the remark. Finally, as noted above, the court gave an extensive curative instruction to the jury directing them to disregard the reference.

While this remark by the witness was unfortunate, given the nature and circumstance in which it occurred, we conclude that the curative instruction was sufficient to eradicate any prejudice resulting from this reference. Thus, the trial court was correct in overruling appellant's motion for a mistrial.

■ Appellant's next argument concerns the admissibility of an address book, and a loose sheet of paper contained within the book, that was discovered on appellant at the time of his booking at the police station. Specifically, appellant maintains that the Commonwealth failed to lay the proper foundation in order to authenticate the identity of the individual who made the entries in the book and on the piece of paper.

The admissibility of evidence is a matter directed to the sound discretion of the trial court, and an appellate court may reverse only upon a showing that the trial court abused that discretion. *Commonwealth v. Wallace,* 522 Pa. 297, 561 A.2d 719 (1989). Generally, for a document to be admissible it must be relevant and authenticated. A document may be authenticated by circumstantial evidence. *Commonwealth v. Brooks,* 352 Pa.Super. 394, 508 A.2d 316 (1986). *See also* McCormick, *Evidence* § 222 (E. Cleary 3d ed. 1984).

The facts germane to this issue center around the testimony of Detective Michael Landis, the interrogating detective who questioned appellant following his arrest. This witness, in testifying about the statements he received from appellant, stated that appellant denied knowing the victims. Following this testimony, the Commonwealth sought to introduce into evidence the address book and the folded loose sheet of paper found in the book. They were relevant, the Commonwealth argues, because the address book contained the name and address of one of the victims, Ms. Wiker, and the sheet of paper had the address and phone number of appellant's co-defendant Sandy Nace written on it. Accordingly, Detective Dennis Arnold testified that he took possession of appellant's

personal belongings at the time of his booking, which included the address book and paper.

Appellant contends that mere possession was not sufficient to indicate that the address book belonged to him. He further contends that there is no evidence he made the entries in the book. Appellant's arguments are addressed, however, more to the weight to be accorded these items rather than their authenticity. This was a question for the factfinder to decide. *See Brenner v. Lesher,* 332 Pa. 522, 524, 2 A.2d 731, 733 (1938); *Brooks, supra.* Appellant's contention, that by introducing this evidence the Commonwealth sought to show that appellant knew Ms. Wiker and therefore had a motive to kill her, is meritless. This evidence was merely a link in the chain of circumstances tending to show appellant's guilt. *See Commonwealth v. Bassi,* 284 Pa. 81, 130 A. 311 (1925). The fact that this address book was in appellant's possession at the time of his arrest and that there was an unbroken chain of custody attested to its authenticity. Whether it actually proved anything, as we have indicated, was a jury question.

Appellant's final contention of error regarding the trial phase pertains to the admission into evidence of the tests results performed on the dried bloodstains found on appellant's boots. Specifically, appellant argues that the trial court erred when it permitted, over objection, expert testimony concerning the results of an electrophoresis test used to determine the genetic makeup of the blood. Appellant asserts that the Commonwealth failed to establish that this test has been generally accepted as reliable in the scientific community because it presented only one expert witness to show the acceptability and scientific reliability of the electrophoresis testing on dried bloodstains.

In *Commonwealth v. Topa,* 471 Pa. 223, 369 A.2d 1277 (1977), this Court established the standards by which scientifically adduced evidence may be qualified for presentation at trial in this Commonwealth. In so doing the Court adopted the principles set forth in *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013 (D.C.1923):

Just when a scientific principle or discovery crosses that line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, *the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.*

*Topa,* 471 Pa. at 230, 369 A.2d at 1281, quoting *Frye, supra* at 47, 293 F. at 1014 (emphasis in original).

The Court in *Topa* stated the rationale for adopting the *Frye* standard in the following terms:

The requirement of general acceptance in the scientific community assures that those most qualified to assess the general validity of a scientific method will have the determinative voice. Additionally, the *Frye* test protects prosecution and defense alike by assuring that a minimal reserve of experts exists who can critically examine the validity of a scientific determination in a particular case. Since scientific proof may in some instances assume a posture of mystic infallibility in the eyes of a jury of laymen, the ability to produce rebuttal experts, equally conversant with the mechanics and methods of a particular technique, may prove to be essential.

*Topa,* 471 Pa. at 232, 369 A.2d at 1282, quoting *United States v. Addison,* 162 U.S.App.D.C. 199, 498 F.2d 741 (1974). *See also Commonwealth v. Nazarovitch,* 496 Pa. 97, 100–103, 436 A.2d 170, 172–173 (1981).

At trial, the Commonwealth called Special Agent Richard E. Reem, a forensic serologist with the Federal Bureau of Investigation, who testified that based on published scientific studies on electrophoresis of dried bloodstains and on his own experience in the field, the test is generally accepted as reliable among experts in the field of forensic serology. Appellant immediately objected. During argument on this issue, appellant failed to offer any evidence, expert or otherwise, that would refute this assertion with the exception of a citation

to another state jurisdiction where the court refused to recognize the test. *See People v. Young,* 425 Mich. 470, 391 N.W.2d 270 (1986).

The purpose of expert testimony is to assist in grasping complex issues not within the ordinary knowledge, intelligence and experience of the jury. *Commonwealth v. Rounds,* 518 Pa. 204, 542 A.2d 997 (1988); *Commonwealth v. McNeely,* 368 Pa.Super. 517, 534 A.2d 778 (1987) *appeal denied,* 520 Pa. 582, 549 A.2d 915 (1988). Moreover, the admission of this testimony is a matter for the discretion of the trial court and should not be disturbed unless there is a clear abuse of discretion. *Commonwealth v. Emge,* 381 Pa.Super. 139, 553 A.2d 74 (1988). This Court has never held that the number of expert witnesses to testify on a given subject is dispositive; rather it is the quality of the expert's testimony which should be the focus of the trial court.

Given the review of this expert's testimony of this test, and in light of the legal standard enunciated in *Topa, supra* and *Frye, supra* we conclude that the trial judge did not abuse his discretion in ruling that this testimony was admissible.[4]

## PENALTY PHASE ERRORS

Appellant raises various issues pertaining to the penalty phase of the proceedings in addition to attacking the constitutionality of our death penalty statute.

First, appellant asserts that the court erred in permitting the Commonwealth to introduce evidence, during the trial's penalty phase, that Marcellus Barnett was appellant's co-defendant during previous crimes of attempted murder, robbery, burglary and criminal conspiracy. These crimes, for which appellant was convicted, occurred at the Lancaster Lanes Bowling Alley just prior to the instant crimes. Appellant contends that the introduction of this evidence was irrelevant and prejudicial and did not advance the Commonwealth's

4. We note that our Superior Court in *Commonwealth v. Middleton,* 379 Pa.Super. 502, 550 A.2d 561 (1988), addressed this precise issue and concluded that electrophoretic analysis of dried blood has gained general acceptance in the national community of forensic serologists.

objective of bolstering Barnett's credibility in the eyes of the jury. Appellant further maintains that it was error to admit this evidence since the Commonwealth is limited to only the evidence pertaining to the aggravating circumstances that it seeks to put before the jury during the sentencing phase.

The Sentencing Code defines the scope of evidence which may be presented at the penalty phase as follows: "Evidence may be presented as to any matter that the court deems relevant and admissible on the question of the sentence to be imposed and shall include matters relating to any of the aggravating or mitigating circumstances specified in subsections (d) and (e)." 42 Pa.C.S. § 9711(a)(2). *See also Commonwealth v. Duffey*, 519 Pa. 348, 548 A.2d 1178 (1988). Evidence is relevant and thus admissible if it tends to establish some material fact or tends to make some fact at issue more or less probable. *Commonwealth v. Dreibelbis*, 493 Pa. 466, 426 A.2d 1111 (1981).

Appellant argues that Marcellus Barnett's credibility was not at issue at this stage and therefore this evidence should not have been admitted. We do not agree with appellant and discern no error by the trial court.

The Commonwealth asserts that the purpose for introducing this evidence was to establish that Barnett and appellant knew each other from a previous criminal episode thereby bolstering Barnett's testimony that he helped appellant plan the instant robbery. Barnett did not testify at this phase of the trial; rather the Commonwealth introduced this evidence via a police detective's testimony concerning appellant's significant history of felony convictions, which was one of the three aggravating circumstances before the jury. Since the evidence presented at the guilt phase is incorporated into the penalty phase of the trial, the credibility of Barnett was still at issue and would be relevant to the jury should it have to balance the aggravating and mitigating circumstances. Moreover, we discern no prejudice here since the jury did not find this aggravating factor. Therefore, we see no merit in this claim.

102

■ Appellant next claims that the trial court erred in denying his motion for a mistrial which was made during the Commonwealth's closing argument in the penalty phase of the trial. Appellant asserts that the prosecutor unfairly commented on facts not offered into evidence. Specifically, in attempting to distinguish appellant from his co-defendant, Sandy Nace, the prosecutor commented that while Nace had never attempted to murder before, appellant had, referring to the crimes committed at the bowling alley mentioned above. At the end of the closing argument, defense counsel called a sidebar conference and requested a mistrial, which the court denied. However, the court did render the following curative instruction to the jury:

The Commonwealth in its arguments in appeal to your reason said to you, differentiating between Mr. Nace and Mr. Zook, said that Mr. Zook killed, attempted to kill before, Mr. Nace did not.

There if no evidence in the record to back up that latter statement with regard to whether or not Mr. Nace has killed or attempted to kill before. The record is totally devoid of any kind of information from which you could come to that conclusion.

Accordingly, as you deliberate in this matter, you may not—you must totally disregard that statement and that argument of the District Attorney in his attempt to differentiate between Mr. Nace and Mr. Zook.

On the issue of prior attempts to kill, you may not consider whether or not Mr. Nace ever attempted or has, in fact, killed. Strike that totally from your mind.

Comments by a prosecutor do not constitute reversible error unless the "unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict." *Commonwealth v. Van Cliff,* 483 Pa. 576, 582, 397 A.2d 1173, 1176 (1979), *cert. denied,* 441 U.S. 964, 99 S.Ct. 2412, 60 L.Ed.2d 1070 (1979) (citation omitted). *See also Commonwealth v. Anderson,* 501 Pa. 275, 461 A.2d 208 (1983). Moreover,

whether this standard has been violated is, in the first instance, a determination within the trial court's discretion, to be reversed on appeal only upon abuse of that discretion. *Id.*

While the prosecutor's comment on Nace's prior criminal activity may have been improper, the trial court did not abuse its discretion in denying appellant's motion for a mistrial. Had the prosecutor *erroneously* commented on *appellant's* prior criminal record, which he did not, then arguably his contention may have merit. However, that is not the present situation, and in light of the court's instruction, we conclude there was no bias fixed or hostility created in the jury's mind as a result of this comment.

Appellant next argues that the trial court's instruction to the jury concerning sympathy and mercy was inadequate in that the court failed to include the following suggested language as offered by appellant: "[s]ince mercy may arise from evidence in mitigation your feeling of mercy standing alone or taken into consideration with other evidence of mitigation may be sufficient to permit a sentence of life imprisonment." Appellant argues that without this language the jury may have been misled into believing that his evidence of mitigation could not legally support a life sentence, and thus appellant contends that the jury did not give full consideration to this evidence.

The trial court instructed the jury on this issue in the following manner:

In making the decision whether or not to impose the death penalty upon Robert Zook, it is entirely proper for you to consider sympathy or mercy as a reason to impose a life sentence.

However, this sympathy or mercy which you may wish to show Robert Zook must be founded upon any one or more— must be founded upon—founded upon evidence any one or more of you find to be a mitigation circumstance.

That's worth repeating. The sympathy or mercy which you may wish to show Robert Zook must be founded upon evidence any one or more of you find to be a mitigating circumstance.

We conclude that the above charge given by the court on mercy and sympathy, while not in appellant's words, was sufficient under our death penalty sentencing scheme.

The Pennsylvania death penalty statute does not permit a jury to avoid imposition of a death sentence through the exercise of an unbridled discretion to grant mercy or leniency. However, the statute does permit a defendant to introduce a broad range of mitigating evidence that can support the finding of one or more mitigating circumstances which may outweigh the aggravating circumstance(s) found by the jury. *See Commonwealth v. Peterkin*, 511 Pa. 299, 513 A.2d 373 (1986), *cert. denied*, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987). The instruction delivered by the court did comport to the statute in this regard. Therefore, there was no error committed by the trial court in denying appellant's request and giving this charge.

Next, appellant argues that the trial court abused its discretion in failing to discharge the jury after it initially returned and informed the court that it was deadlocked and unable to reach a unanimous verdict. This occurred in the early evening after four and one-half hours of deliberation. When the jury returned, the following exchange took place:

THE COURT: All right Mr. Foreman, I understood the jury has communicated that they have been unable to reach a unanimous verdict, is that right?

THE FOREPERSON: Yes, your Honor.

THE COURT: You may sit down. I must make some inquiries of you with regard to that. Do you believe there is a reasonable probability of the jury being able to reach a unanimous verdict in this case?

THE FOREPERSON: No, I don't believe, your Honor.

THE COURT: You have been out, I think, about four-and-a-half hours, which in the scheme of things really isn't that long. On the other hand, all that the law requires of you is conscientious deliberations in an attempt to reach an unanimous verdict without anybody surrendering their individual judgment and will.

I do believe you owe a responsibility to reach a unanimous verdict if it can be done without violence to your individual sense of judgment and as you consider all the evidence in this case.

I respect your view that that is the case, but I am going to ask you go out and try again. If you cannot, then come back. All right. Thank you.

The jury was sent back to the jury room at approximately 8:20 P.M. to continue its deliberations. At this point defense counsel moved the court to enter a verdict of life imprisonment based on the foreman's answers to the court's questions. The court denied the motion.

At approximately 10:55 P.M., following two and one-half hours of further deliberations, the jury returned to the courtroom and the following colloquy took place:

THE COURT: All right. The foreman please rise. Has the jury reached a verdict in this case?

THE FOREPERSON: We have not, your Honor.

THE COURT: You have not?

THE FOREPERSON: We are not unanimous.

THE COURT: You are not unanimous and there is—are you hopelessly deadlocked in your opinion?

THE FOREPERSON: I don't think we are deadlocked, no. We'd like to have more time if we could.

THE COURT: You want more time? You want it tonight or tomorrow?

THE FOREPERSON: I think we are in agreement that we would like to get a night's sleep and try some more tomorrow.

THE COURT: Very well. All right. We will recess....

The next morning, following further deliberations, the jury reached its verdict.

In these situations, this Court has set forth the following standard of review:

The length of the deliberation of a jury is wisely left to the sound discretion of the trial judge, and we reverse only if we find ... abuse of discretion, or that the verdict was

the product of coercion or of an overworked and fatigued jury.

*Commonwealth v. Penn,* 497 Pa. 232, 246, 439 A.2d 1154, 1161 (1982), *cert. denied,* 456 U.S. 980, 102 S.Ct. 2251, 72 L.Ed.2d 857 (1982), quoting *Commonwealth v. Campbell,* 445 Pa. 488, 495–96, 284 A.2d 798, 801 (1971); *Commonwealth v. Clark,* 404 Pa. 143, 146, 170 A.2d 847, 848 (1961).

Appellant argues that since the jury foreman initially indicated that the jury was unable to reach a unanimous verdict, the court should have discharged the jury and imposed a life sentence. Appellant directs us to the Sentencing Code, which provides in pertinent part:

> (v) the court may, in its discretion, discharge the jury if it is of the opinion that further deliberation will not result in a unanimous agreement as to the sentence, in which case the court shall sentence the defendant to life imprisonment.

42 Pa.C.S. § 9711(c)(1)(v). Moreover, appellant suggests that such a response by the jury foreman that the jury was not unanimous was tantamount to a verdict of life imprisonment since the statute provides that the verdict must be life unless "the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances." 42 Pa.C.S. § 9711(c)(1)(iv). We disagree with appellant's position and find no abuse of discretion by the trial court. Given the length of the trial, i.e., five days, and the solemnity of the proceedings, it was entirely proper for the court to request further consultation of the jury, after only four and one-half hours of deliberations. Furthermore, there is no indication in this record that the verdict rendered by the jury was the product of a coerced or fatigued jury.

■ Appellant next contends that his death sentences must be reversed because only eleven of the twelve jurors were individually polled by the court following the rendering of the verdicts. The facts pertaining to his argument follow.

On March 21, 1990, approximately two months after the verdict, the trial court entered an order directing that a

hearing be conducted pursuant to Rule 1926 of our Rules of Appellate Procedure for the purpose of determining the accuracy of the jury poll held following the verdicts. The court observed that the transcript of the proceedings lodged with the court reflected that only 11 of the 12 jurors were individually polled on the verdicts. Answers from Juror No. 11 did not appear in the record. The record did indicate, however, that after the individual polling took place, the jury as a whole, including Juror No. 11, was instructed to rise in the jury box, and the following questions were asked:

THE CLERK: Please rise. Harken to your verdict as the court hath recorded in the issue between the Commonwealth of Pennsylvania and Robert Peter Zook, Jr. The verdict was death, so say you all?

THE JURY: Yes.

THE COURT: Now do it as to each count.

THE COURT: As to each count?

THE COURT: In the death of Paul Conrad the verdict of the jury is death?

THE JURY: Yes.

THE CLERK: And in the death of Sandra Wiker the verdict is?

THE JURY: Death

THE COURT: Death?

THE JURY: Yes.

THE CLERK: So say you all?

THE JURY: Yes.

THE COURT: All Right. Please be seated. All right.

Upon discovering that Juror No. 11 was not individually polled, based on review of the certified transcript filed by the court reporter, the court ordered a hearing to take place to determine the accuracy of the record. At this time both the clerk that served at the trial and the juror in question testified. The clerk testified that to the best of her knowledge and belief she had called the names of all the jurors during the polling. The record, however, does not reflect this fact.

The court then examined Juror No. 11 on what he recalled transpired the morning the verdict was rendered. When asked if he remembered standing up and answering questions about the verdict, he answered that he did. During the court's questioning of this juror on the verdict, and specifically on the questions contained within verdict sheet pertaining to whether the aggravating circumstances found by the jury outweighed the mitigating circumstance found, i.e., mercy, the juror displayed some confusion in answering these questions. Eventually, with the court's further questioning this juror grasped the concept of the question and indicated that he concurred with the jury's verdict that the aggravating circumstances outweighed the mitigating circumstance and with the sentence of death rendered.

In light of Juror No. 11's answers given while standing as a group with the other jurors on the day the verdicts were rendered, and to the answers given at the Rule 1926 hearing, we are convinced that the jury verdicts in this case were unanimous.

Appellant next complains that the trial court erred in permitting the Commonwealth to seek the death penalty based on the alleged failure of the Commonwealth to comply with the notice requirements of Rule 352 of the Pennsylvania Rules of Criminal Procedure. This rule, effective July 1, 1989, provides for the following:

The Commonwealth shall notify the defendant in writing of any aggravating circumstances which the Commonwealth intends to submit at the sentencing hearing. Notice shall be given at or before the time of arraignment, unless the attorney for the Commonwealth becomes aware of the existence of an aggravating circumstance after arraignment or the time for notice is extended by the court for cause shown.

Pa.R.Crim.P. 352.

Since this was appellant's second trial on these charges, the arraignment in this matter occurred several years prior to the effective date of the rule. Prior to the adoption of the rule, no

notice was required. *Commonwealth v. Yarris*, 519 Pa. 571, 549 A.2d 513 (1988), *cert. denied*, 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 708 (1989). Appellant argues, however, that it should have received notice within thirty days after the United States Supreme Court's denial of the Commonwealth's Petition for Writ of Certiorari filed in response to this Court's grant of a new trial.[5] We find no basis for this assertion.

The Commonwealth informed appellant by letter of the aggravating circumstances it would seek to establish one week prior to trial and approximately two and one-half weeks prior to the commencement of the sentencing hearing. We conclude that under the circumstances of this case this was sufficient notice, particularly since this was appellant's second trial, and he was aware of the existence of potential aggravating circumstances.

In *Commonwealth v. Edwards*, 521 Pa. 134, 555 A.2d 818 (1989), a case decided four months prior to the effective date of Rule 352, this Court concluded that it was not error for the trial court to allow the Commonwealth to announce for the first time at a short recess prior to the penalty phase that it would present torture as an aggravating circumstance, since a defendant is automatically put on notice that the Commonwealth will attempt to establish one or more of the statutory aggravating circumstances as set forth in the statute in every case where the Commonwealth will seek the death penalty.

Appellant contends next that the trial court erred in denying his motion to bar the imposition of the death penalty upon his retrial claiming that he was prejudiced by this Court's grant of a new trial. The theory relative to this issue is as follows. On February 2, 1989, this Court granted appellant's request for a new trial because of a Fifth Amendment violation that occurred during his interrogation concerning the murders. In his first direct appeal to this Court, appellant alleged a total of twenty-five errors that he asserted occurred during the guilt and penalty phases of the trial. Because of the disposition of the Fifth Amendment issue, we did not

5. *See Pennsylvania v. Zook,* 493 U.S. 873, 110 S.Ct. 203, 107 L.Ed.2d 156 (1989).

address appellant's other issues. Herein lies appellant's perceived prejudice.

At the time of his first appeal, Section 9711(h) of the death penalty statute, gave this Court the power to vacate a death sentence and remand for the imposition of a life sentence if we determined that the death sentence was improper. On December 21, 1988, this section of the statute was amended to provide for a new sentencing hearing if a death sentence is reversed for errors in the penalty phase and not simply for the imposition of a life sentence.[6] Appellant now argues that had this Court addressed and resolved in his favor his allegedly meritorious sentencing phase issue regarding the determination of mitigating circumstances pursuant to *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), before the change in the statute, then he would have received a life sentence and not subject to a second trial thereby exposing himself to the possibility of receiving a second death sentence. Appellant's speculation on the success of this issue is clearly moot. Since we rendered our decision granting a new trial after the change in the statute and the statute as passed applied to pending cases, even if appellant had been successful on this penalty phase issue, he would only have been entitled to a new sentencing hearing.

Appellant also raises various other challenges to the death penalty statute. Appellant concedes that this Court has repeatedly rejected challenges to the constitutionality of the statute; however, he has asserted the issues so we may, if we choose, reconsider our position. We decline this invitation.

6. The amended statute reads:
  (h) **Review of death sentence.—**
  . . . .
  (4) If the Supreme Court determines that the death penalty must be vacated because none of the aggravating circumstances are supported by sufficient evidence or because the sentence of death is disproportionate to the penalty imposed in similar cases, then it shall remand for the imposition of a life imprisonment sentence. If the Supreme Court determines that the death penalty must be vacated for any other reason, it shall remand for a new sentencing hearing pursuant to subsections (a) through (g).
  42 Pa.C.S. § 9711(h)(4).

We paraphrase and list appellant's specific arguments regarding our death penalty statute:

1) the death sentences is an infliction of cruel and unusual punishment;

2) the requirement that aggravating circumstances must outweigh mitigating circumstances is vaguely phrased to permit unbridled discretion to the jury;

3) the requirement that defendant prove mitigating circumstances by a preponderance of the evidence is unconstitutional;

4) the imposition of mandatory death sentence where jury finds one aggravating circumstance and no mitigating circumstances or where jury finds that the aggravating circumstances outweigh any mitigating circumstances is unconstitutional;

5) the consideration of mercy is precluded by the statute where there are no mitigating circumstances and one or more aggravating circumstances, and this preclusion is violative of appellant's constitutional rights;

6) the aggravating circumstance pertaining to commission of a killing while in the perpetration of a felony is unconstitutionally vague and arbitrary, in that it fails to specify which felonies are included;

7) the statute fails to provide for any meaningful historical proportionality review and to allow participation by a defendant and counsel;

8) the discretion of the Commonwealth to seek to not to seek the death penalty vitiates fairness and equal protection under the law;

9) the statute limits the type of mitigating evidence to those which are enumerated therein;

10) the statute fails to provide for a specific mitigating circumstance if a defendant is an accomplice to the actual perpetrator of the killing;

11) the bifurcated sentencing procedures denied equal protection to a defendant who demands a trial by jury as opposed to a defendant who elects a bench trial during guilt

phase since the same jury must decide both guilt and what sentence to impose;

12) the statute improperly limits the full exercise of discretion by the sentencing jury;

13) the statute fails to provide any fixed standard for weighing aggravating and mitigating circumstances; and

14) the statute is arbitrary and capricious since the Governor is vested with the discretion to commute any given death sentence to a life sentence.

The bulk of appellant's constitutional issues have been previously resolved by this Court, and we see no reason to render further comment. *See Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990), affirming *Commonwealth v. Blystone*, 519 Pa. 450, 549 A.2d 81 (1988); *Commonwealth v. DeHart*, 512 Pa. 235, 516 A.2d 656 (1986), *cert. denied*, 483 U.S. 1010, 107 S.Ct. 3241, 97 L.Ed.2d 746 (1987); *Commonwealth v. Peterkin*, 511 Pa. 299, 513 A.2d 373 (1986), *cert. denied*, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987); *Commonwealth v. Morales*, 508 Pa. 51, 494 A.2d 367 (1985); *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700 (1984), *cert. denied*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984); *Commonwealth v. Zettlemoyer, supra.* However, we do feel compelled to comment on certain assertions made by appellant.

First, appellant maintains that the procedures adopted by this Court in order to make a determination on the proportionality of similar cases in which the death penalty is imposed are insufficient and inadequate and excludes a defendant and counsel from participation. We disagree. While the Sentencing Code does not define "similar cases," nor set forth any specific procedures for conducting this review, this Court has recognized its independent, statutory obligation to determine, *inter alia*, whether the sentence is excessive or disproportionate to that imposed in similar cases. *See Zettlemoyer, supra.*

Moreover, in *Commonwealth v. Frey, supra*, we ordered the institution of the Pennsylvania Death Penalty Study, and imposed an ongoing obligation on the President Judge of every county to supply data to the Administrative Office of the

Pennsylvania Courts (AOPC) on each first degree murder conviction. For each such case, information has been compiled "concerning the age, race and sex of the defendant and the victim, whether the death penalty was sought, the aggravating and mitigating circumstances presented and the evidence relating thereto, the sentence imposed, related charges and the disposition thereof, and data concerning any co-defendants." *DeHart*, 512 Pa. at 260, 516 A.2d at 669. The information is then utilized by this Court in conducting its proportionality review.

While appellant is correct in stating that the statute does not specifically provide for his and counsel's participation in the proportionality review performed by this Court, he is mistaken in his assertion that he is in fact excluded therefrom. As we noted in *DeHart*, the data maintained by the AOPC is available to appellant and counsel without cost. Moreover, we note that the United States Supreme Court has held that such a comparative proportionality review of a death sentence is not even required under the Eighth Amendment of the United States Constitution. *See Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

Next, appellant argues that the statute is unconstitutional for failing to provide for a specific mitigating circumstance in the event a defendant is an accomplice and not the actual perpetrator of the killing. Specifically, appellant argues that without a specific delineated mitigating factor, the jury may believe that it should not consider this particular fact surrounding the killing. The General Assembly obviously deemed it unnecessary to include accomplice participation in a killing as a specific mitigating factor. However, our statute provides a jury with a list of mitigating factors which may be taken into account, including a "catchall" category providing for the consideration of "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstance of his offense." 42 Pa.C.S. § 9711(e)(8). *See Blystone v. Pennsylvania, supra.* Appellant, of course, may argue his "non-culpability" to the jury at the sentencing phase, and the jury is permitted to consider it. Merely because the

General Assembly did not specify this factor as a consideration does not amount to a constitutional violation.

Appellant next argues that the imposition of a death sentence "under the laws that presently exist in the Commonwealth of Pennsylvania" is subject to arbitrary and capricious application since the Governor is vested with the discretion to commute any given death sentence to a sentence of life imprisonment. With nothing more than the above assertion we are left to speculate that appellant is arguing that the power of commutation is placed within one official's hands without clear guidelines, and that the placement of such power in one individual is offensive to our notions of due process. Should this be appellant's argument, we must disagree.

The Governor's power to commute sentences is found within Article IV, § 9 of the Pennsylvania Constitution. *See generally Commonwealth v. Sutley,* 474 Pa. 256, 378 A.2d 780 (1977). Under our Constitution of 1776, § 20, the Supreme Executive Council had the power to grant pardons and remit fines in all cases except in cases of impeachment. This doctrine has evolved over the years into the present day enactment, which provides in pertinent part:

> (a) In all criminal cases except impeachment, the Governor shall have power to remit fines and forfeitures, to grant reprieves, commutation of sentences and pardons; but no pardon shall be granted, nor sentence commuted, except on the recommendation in writing of a majority of the Board of Pardons, after full hearing in open session, upon due public notice. . . .

Pa. Const. art. IV, § 9.

Given the above provision requiring the concurrence of a majority of the Board of Pardons, following a full hearing, before a commutation of sentence may be effectuated by the Governor, we conclude that appellant's concerns are unfounded.

Appellant's next contention pertains to the trial court's denial of his "Motion to Bar Consideration of Aggravating Circumstances and Imposition of Death Penalty" because

of double jeopardy principles. Specifically, appellant maintains that the Commonwealth should have been precluded from seeking the death penalty at his retrial since it submitted to the jury at the second penalty phase an additional aggravating circumstance not invoked or found by his first sentencing jury.

At the first trial, the Commonwealth offered two aggravating circumstances; namely, that the offense was committed by means of torture, 42 Pa.C.S. § 9711(d)(8); and that the defendant committed a killing while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6). The jury found the evidence was sufficient to support these aggravating circumstances and sentenced appellant to death.

At his second sentencing hearing the Commonwealth elected to not pursue the torture factor, presented the "perpetration of a felony" factor as it did during the first trial, and presented evidence directed to two additional aggravating factors. The two additional aggravating circumstances were that appellant had a significant history of felony convictions involving the use or threat of violence, 42 Pa.C.S. § 9711(d)(9), and that appellant had been convicted of another murder, committed either before or at the time of the offense at issue, 42 Pa.C.S. § 9711(d)(11).

The jury found that the evidence supported the finding of the perpetration of a felony factor and the multiple murder factor. Appellant now argues that double jeopardy barred the Commonwealth from seeking the death penalty based on the multiple murder aggravating factor since it was not offered and found by the first jury in his initial trial. Appellant asserts that since the trial court in his first trial "specifically found that there was no evidence presented" to sustain the Commonwealth's burden of proving this specific aggravating circumstance, then double jeopardy principles should preclude reliance on this factor in any future trial. Furthermore, he maintains that where a jury does not find a particular aggravating circumstance, then the legal conclusion is that the Commonwealth has failed to present sufficient evidence, and

this is therefore akin to an acquittal of that particular aggravating factor.

In support of this theory appellant relies on *Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981). There the United States Supreme Court held that a defendant sentenced to life imprisonment in a capital case is protected by the Double Jeopardy Clause of the Fifth Amendment against the imposition of the death penalty should he obtain reversal of his conviction and is retried and later convicted. Reliance by appellant on *Bullington* is misplaced since in this case appellant was originally sentenced to death following his first trial.

Our Superior Court recently decided a similar issue in *Commonwealth v. Gibbs*, 403 Pa.Super. 27, 588 A.2d 13 (1991), *appeal granted*, 528 Pa. 628, 598 A.2d 281 (1991). Defendant Barry Gibbs was sentenced to death. On direct appeal, this Court found that his confession was involuntarily given and vacated the judgment of sentence and remanded for a new trial. *Commonwealth v. Gibbs*, 520 Pa. 151, 553 A.2d 409 (1989), *cert. denied*, 493 U.S. 963, 110 S.Ct. 403, 107 L.Ed.2d 369 (1989). The defendant then sought to preclude the Commonwealth from seeking the death penalty at his second trial based on aggravating circumstances not found by the sentencing jury at his first trial. The trial court denied this motion. The court thereafter certified the denial order pursuant to 42 Pa.C.S. § 702(b), determining that the order involved controlling questions of law and that an appeal would materially advance the ultimate termination of the matter.

Gibbs argued to the Superior Court that the Commonwealth should be precluded from seeking the death penalty in his retrial based upon aggravating circumstances argued but not found by his sentencing jury in his first trial. The court rejected this argument and based its decision primarily on the rationale set forth in the United States Supreme Court's decision in *Poland v. Arizona*, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986).

The *Poland* court, faced with a comparable issue, distinguished *Bullington, supra*, and stated:

We reject the fundamental premise of petitioners' argument, namely, that a capital sentencer's failure to find a particular aggravating circumstance alleged by the prosecution always constitutes an 'acquittal' of that circumstance for double jeopardy purposes. *Bullington* indicates that the proper inquiry is whether the sentencer or reviewing court has 'decided that the prosecution has not proved its case' *that the death penalty is appropriate.* We are not prepared to extend *Bullington* further and view the capital sentencing hearing as a set of mini-trials on the existence of each aggravating circumstance. Such an approach would push the analogy on which *Bullington* is based past the breaking point.

Aggravating circumstances are not separate penalties or offenses, but are 'standards to guide the making of [the] choice' between the alternative verdicts of death and life imprisonment. Thus, under Arizona's capital sentencing scheme, the judge's finding of any particular aggravating circumstance does not of itself 'convict' a defendant (i.e., require the death penalty), and the failure to find any particular aggravating circumstance does not 'acquit' a defendant (i.e., preclude the death penalty).

*Poland,* 476 U.S. at 155–56, 106 S.Ct. at 1755 (citation and footnote omitted, emphasis in original).

As noted by the Superior Court, our death penalty statute is similar to the Arizona statute in that aggravating circumstances are standards to guide the making of the determination, to wit: if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstances, or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances, then the verdict must be death. 42 Pa.C.S. § 9711(c)(1)(iv).

We agree with this analysis and adopt the Superior Court's rationale in *Gibbs:*

Following the reasoning of *Poland,* it is not the finding of the presence or absence of an aggravating circumstance that is dispositive of whether the defendant will receive the death sentence, but rather it is the ultimate conclusion

reached after the factfinder weighs all the factors found, both aggravating and mitigating. Put simply, if the factfinder in the first trial imposes the death penalty, double jeopardy never attaches, and the prosecution may seek the death penalty in a second trial based upon any of the statutory grounds it finds relevant, regardless of whether they were found or not found in the first trial.

In this case, the sentencing jury in the first trial returned a verdict of the death sentence. Therefore, under *Poland*, no matter what aggravating factor that jury considered, so long as they found that the presence of one or more factors weighed with other circumstances warranted the death penalty, the prosecution is not precluded from seeking to prove specific aggravating factors and is clearly not precluded from again seeking the death penalty.

*Gibbs*, 403 Pa.Super. at 36, 588 A.2d at 17. Based on the foregoing analysis we discern no double jeopardy violation in this case.

On this issue, appellant further urges this Court to adopt the "fundamental fairness" approach utilized by the New Jersey Supreme Court in *State v. Biegenwald*, 110 N.J. 521, 542 A.2d 442 (1988). In addressing the state's ability to introduce evidence of new aggravating factors at a subsequent sentencing hearing in capital cases, the Court held that the principles of fundamental fairness dictate that "the State will be permitted to introduce new aggravating factors only when it proves to the court that it has discovered new evidence sufficient to establish at resentencing a new aggravating factor and that such evidence was unavailable and undiscoverable at the original trial despite the state's diligent efforts." *Id.* at 541–42, 542 A.2d at 452. We decline to accept appellant's invitation to embrace this concept and rely instead on the analysis previous discussed.

■ Appellant's final contention again pertains to the multiple murder aggravating factor found at Section 9711(d)(11). This factor as mentioned above, was enacted into law as an amendment to the death penalty statute and became effective on September 5, 1986. Appellant specifically argues that the

General Assembly intended this aggravating circumstance should apply prospectively only and not to offenses committed before the effective date. Therefore, he maintains that the death sentence in this case is illegal and improper since the jury improperly relied on this factor in rendering its death verdict.

In the alternative, appellant asserts that should this Court determine that the legislative intent contemplated retroactive application of this factor, then the prohibition against *ex post facto* laws would preclude the Commonwealth from presenting evidence to the jury on this circumstance. Appellant is mistaken on both aspects of his argument for the following reasons.

Although the multiple murder aggravating factor was enacted after the murders were committed in this case, this fact is of no moment since this factor is similar in substance to an existing factor found at Section 9711(d)(10). This latter factor comes into play when a "defendant has been convicted of another Federal or State offense, committed either before or at the time of the offense at, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense." While the language is different, both factors encompass first degree murder and therefore there is little difference in substance or effect to the instant case. The Commonwealth could have presented its evidence on the second murder under either aggravating factor.

In *Commonwealth v. Cross*, 508 Pa. 322, 496 A.2d 1144 (1985) (plurality opinion), this Court stated that the General Assembly clearly intended Section 9711(d)(10) to include the case of multiple murders, citing the following language found in *Commonwealth v. Travaglia*, 502 Pa. 474, 495–501, 467 A.2d 288, 298–300 (1983), *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984), *reh'g. denied* 468 U.S. 1226, 105 S.Ct. 27, 82 L.Ed.2d 920 (1984):

"[t]he clear import of the first part of subsection (d)(10) is to classify the commission of multiple serious crimes as one of

the bases upon which a jury might rest a decision that the crime of which the defendant stands convicted, and for which they are imposing sentence, merits the extreme penalty of death."

*Cross,* 508 Pa. at 339, 496 A.2d at 1153.

In addition, this Court held that the term "convicted," as used in the factor, meant "found guilty of," and not necessarily "found guilty of and sentenced." *Id.* Consequently, the fact that the Commonwealth chose to proceed in this trial, as well as in the first trial, under the more recently enacted aggravating factor did not prejudice appellant because the Commonwealth could have proceeded under the earlier factor since the evidence necessary to establish this factor was the same for both.

In *Poland, supra,* the United States Supreme Court articulated again the rule that when a defendant obtains a reversal of his conviction on appeal:

the original conviction has been nullified and 'the slate wiped clean.' Therefore, if the defendant is convicted again, he constitutionally may be subjected to whatever punishment is lawful, subject only to the limitation that he receive credit for time served. [*Bullington,* 451 U.S.] at 442 [101 S.Ct. at 1860] quoting *North Carolina v. Pearce,* 395 U.S. 711 [89 S.Ct. 2072, 23 L.Ed.2d 656] (1969).

*Poland,* 476 U.S. at 152, 106 S.Ct. at 1753.

We note that in a *pro se* supplemental brief filed with this Court following oral argument appellant argues that his trial counsel was ineffective for failing to object to the Commonwealth's use of this aggravating factor. Having concluded above that there was no error committed by the Commonwealth and the trial court in utilizing and permitting, respectively, this aggravating factor at the second sentencing hearing, appellant has failed in his burden of demonstrating that this allegation of ineffectiveness possesses arguable merit, a requirement that must be met before a defendant may prevail on an ineffectiveness claim. *See Commonwealth v. Hentosh,* 520 Pa. 325, 554 A.2d 20 (1989); *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987); *Commonwealth ex rel. Washing-*

*ton v. Maroney*, 427 Pa. 599, 235 A.2d 349 (1967). Consequently, our inquiry on this issue is at an end.

Finally, we address the proportionality of appellant's sentence. Following our review of the record we are convinced that the sentence of death was a product of the evidence and not a product of "passion, prejudice or any other arbitrary factor." 42 Pa.C.S. § 9711(h)(3). Moreover, based on our review of the statistical data provided by the Administrative Office of Pennsylvania Courts pursuant to *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700 (1984), *cert. denied*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984), we conclude that the sentences of death imposed upon appellant are neither excessive nor disproportionate to the penalty imposed in similar cases.

For the foregoing reasons, we sustain the convictions of first degree murder and affirm the sentences of death.[7]

NIX, C.J., ZAPPALA and CAPPY, JJ., concur in the result.

---

**7.** The prothonotary of the Supreme Court of Pennsylvania is directed to transmit the full and complete record of the trial, sentencing hearing, imposition of sentence and review by this Court to the Governor, pursuant to 42 Pa.C.S. § 9711(i).