J-S77044-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| REUBEN MCDOWELL | : | |
| | : | No. 2062 MDA 2016 |
| Appellant | | |

Appeal from the Judgment of Sentence July 6, 2016
In the Court of Common Pleas of Lycoming County Criminal Division at
No(s):  CP-41-CR-0000017-2013,
CP-41-CR-0000035-2013, CP-41-CR-0000063-2013,
CP-41-CR-0001382-2013

BEFORE:   BENDER, P.J.E., LAZARUS, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.:                **FILED JANUARY 22, 2018**

Reuben McDowell, Appellant, appeals from the judgment of sentence entered in the Court of Common Pleas of Lycoming County after a jury, sitting in Appellant's consolidated trial, found him guilty of multiple counts of burglary, robbery, criminal trespass, stalking, theft, and related crimes on evidence that he targeted elderly women returning home from grocery stores and forcibly took their purses and other belongings.  Sentenced to an aggregate sentence of 26 to 64 years' incarceration, Appellant presents eleven issues for our review.  We affirm.

The trial court sets forth an apt factual and procedural history of the case as follows:

_____
* Former Justice specially assigned to the Superior Court.

On or about December 12, 2012, [Pennsylvania State] Trooper Matthew Sweet was assigned to investigate several recent robberies. He reviewed reports of some of the incidents and [had been the responding officer [in one]. He developed some leads regarding the suspect and his vehicle (black male driving a silver/goldish/beige mid-sized SUV). He further identified a modus operandi (MO) of the suspect (robbing elderly women coming from or participating in shopping).

On December 13, 2012, he along with several other troopers began a surveillance detail. The surveillance team conducted surveillance from December 13, 2012, to December 15, 2012, and from December 17, 2012, to December 20, 2012. As the investigation proceeded, more leads were developed. The description of the possible suspect became more defined (black male, stocky, broad chested, bald, middle aged or elderly, clean shaven). As well, it appeared that certain stores or shopping centers were targeted including the Giant Plaza, Wegmans, and Aldi's. Further, the crimes would "generally" occur when the victims were either returning to their vehicles after shopping or returning home. As well, the suspect had used force in at least some of the incidents. Some of the victims were "attacked" within a minute or two of returning home. Others were outside while some had actually been inside their homes. Most of the crimes occurred between the late morning and approximately 5:00 p.m. All of the alleged victims were women in their 80's. Videos and pictures from surveillance cameras were obtained and viewed. A Lycoming College surveillance camera depicted the suspect vehicle as a gold-colored SUV. A Weis Market surveillance camera depicted the suspect. A picture was obtained of a suspect using a victim's stolen credit card. The suspect as viewed matched the description as given by the victims.

On December 20, 2012, at approximately 2:00 p.m., Troopers Sweet and Holmes were conducting undercover surveillance at the Giant Plaza. They observed [Reuben] McDowell [hereinafter "Appellant'] pull his vehicle, a gold/beige-colored SUV, in front of their vehicle. Appellant was "acting very suspicious." He kept pulling in and out of various parking stalls. He was looking around and appeared very nervous. It "appeared to [the troopers] that he was looking for a potential victim."

Appellant eventually pulled his vehicle in front of an elderly woman, later identified as [M.B.], who was putting some of her

- 2 -

groceries or merchandise in her vehicle. As soon as [M.B.] got in her vehicle and pulled out of the parking lot, Appellant followed her. He followed [M.B.] "up to basically her residence." According to Trooper Sweet, "Every move she made, he made." As [M.B.] turned onto the roadway to her residence, . . . Appellant turned onto an adjacent roadway, . . . in very close proximity to [M.B.'s] residence and backed into a driveway. Trooper Sweet opined that Appellant was observing [M.B.] He was parked in "a very close vicinity." "It's basically across a tree line up to a residential area[," the trooper testified.] Appellant then left the area, drove a few miles away, and then returned within minutes, this time actually driving up [M.B.'s] street, which ends in a cul de sac.

Appellant drove past [M.B.'s] house. He turned around in the driveway of a residence one house away and traveled back down toward [M.B.'s] house. [M.B.] was still carrying groceries into her house with her trunk still open. The troopers blocked the roadway, surrounded Appellant's vehicle and, with guns drawn, ordered Appellant out of his vehicle. Appellant did as directed. He was removed from his vehicle and immediately taken into custody. He was handcuffed and placed in a patrol unit.

\*\*\*

After being transported to the state police barracks, Appellant was held for processing and then brought to an interview room. While at the barracks and after being Mirandized,[1] the troopers questioned Appellant regarding his conduct that day.

\*\*\*

[In addition to interviewing Appellant, Trooper Sweet and others continued their investigation in other respects. They] typed up search warrants for the vehicle [Appellant] was driving, his residence and his phone; spoke with some of the victims from the prior incidents; spoke briefly with [M.B.]; prepared photo arrays; met with at least two prior victims who viewed the photo arrays and identified Appellant . . . as the perpetrator of the crimes against them; reviewed the investigative reports from the other incidents; conducted an inventory search of the car; obtained and executed a search warrant at Appellant's residence; conversed with the assistant district attorney on call; and typed up charges.

---

[1] ***Miranda v. Arizona***, 384 U.S. 436, 86 S.Ct. 1602 (1966).

The search warrant was executed on Appellant's residence at approximately 10:00 p.m. Numerous incriminating items were seized. The vehicle Appellant had been driving was towed to the PSP impound for processing. A custodial inventory search was initially conducted. A search warrant for the vehicle was obtained that day but not executed until the following day. The two searches of the vehicle uncovered several items of significance incriminating Appellant.

***

In CR-17-2013, Trooper Matthew Sweet filed a criminal complaint against Appellant on December 20, 2012, charging [him] with assault, burglary, robbery, criminal trespass, stalking, theft, receiving stolen property, simple assault, recklessly endangering another person and harassment.

The charges relate to an incident involving [J.H.], an 86 year-old female. On December 12, 2012, she went to the Giant Shopping Center in Loyalsock to buy groceries. She returned to her house at approximately 1:00 p.m. While in the process of bringing her groceries into the house from her car, she noticed the handle on the front door being moved. Thinking it was the mailman, she went to open the door, but was pushed back and fell on the floor. The intruder kicked the victim several times, located her purse, took her wallet and an envelope containing cash, and then left the home. Through the use of a photo lineup or array on December 20, 2012, the victim identified Appellant as the individual who robbed her.

In CR-35-2013, Trooper Sweet filed a criminal complaint against Appellant on December 21, 2012, charging Appellant with forgery, identity theft, theft from a motor vehicle, access device fraud, and theft by unlawful taking. Under this Information, [P.E.], an 86 year-old female, was grocery shopping at Aldi's in Loyalsock Township on December 12, 2012. While she was returning the shopping cart, Appellant stole her purse from her vehicle. Among the items taken from the purse was a credit card, which was subsequently used at Weis Markets. The surveillance video from Weis Markets showed an African American individual with sunglasses, a black hat and black coat. Similar clothing was eventually seized from a vehicle Appellant was operating. Furthermore, a subsequent search of Appellant's residence, pursuant to a search warrant, yielded items that were purchased

on December 13 with the victim's credit card. Moreover, when Appellant was taken into custody, he admitted to the crimes. Specifically, he told police officers that while the victim was returning her cart, he saw an opportunity to take the purse. He removed it from the car and ultimately used the credit card at various locations.

In CR-62-2013, Agent Raymond Kontz, III, of the Williamsport Bureau of Police, filed a criminal complaint against Appellant on December 31, 2012, charging him with robbery, theft by unlawful taking, receiving stolen property, recklessly endangering another person, simple assault and theft from a motor vehicle. The crimes arose out of an incident on December 7, 2012. On December 7, 2012, while returning from grocery shopping, eighty-two year old [M.M.] stopped to check the movie times at the Williamsport Cinema Center. She came in contact with an individual as she was getting into her car. A struggle ensued when he assailant was attempting to take the purse. The assailant eventually obtained the purse after pressing a pressure point on the victim's hand. On December 22, 2012, the victim identified Appellant as the perpetrator from a photo array.

While subsequently in custody, Appellant admitted that he saw the victim in the parking lot area and acknowledged that she was older. He thought that he could take her purse without having to confront her but was surprised when she fought.

In CR-1382-2013, the police filed a criminal complaint against Appellant on February 13, 2013, charging him with robbery, stalking, theft by unlawful taking, receiving stolen property, harassment, burglary, criminal trespass, access device fraud and theft from a motor vehicle. The crimes were alleged to have occurred between December 9, 2012 and December 16, 2012. During that span of time, four more women in their eighties had their purses stolen from their person or their residence after shopping at either the Wegmans, Aldi's, or Giant grocery stores.

The first was [A.F.]. In December of 2012 after returning to her home from the library and while trying to get into her apartment an individual grabbed her purse, stole it, ran to his car and drove away. [A.F.] was 85 year old and resided in Williamsport. She had previously been shopping at the Wegmans grocery store in Williamsport.

On December 11, 2012, at approximately noon, [M.C.], then 83 years old was unloading groceries. She had been previously shopping at the Giant in Loyalsock. While putting away her groceries, she placed her purse on a chair inside her front door. After she had put all of the groceries on the table, she started looking for her purse, but it was gone. It was eventually returned to her a few hours later by a third party who indicated that it was found on the road "not too far." The cash in the purse had been taken.

A few hours later, at approximately 4:30 in the afternoon, an assailant entered the residence of [M.E.], an 84 year-old female who also resided in the Loyalsock area, shortly after she returned home from the Giant grocery store. The assailant stole money from [M.E.'s] purse which was on the kitchen counter.

On December 16, 2012, at approximately 4:00 in the afternoon, [D.M.], an 82 year-old female, had her purse stolen from out of her vehicle at the Aldi's parking lot. She was returning her cart to the designated cart collection area. She observed the actor removing her purse and fleeing in a vehicle. Her purse was found nearby her residence and returned to her. Her credit cards had been used.

A jury trial was held March 14-18, 2016.

Under information 17-2013, the jury found Appellant guilty of burglary, robbery, criminal trespass, stalking, theft by unlawful taking, receiving stolen property, simple assault and recklessly endangering another person.

Under information 35-2013, the jury found Appellant guilty of forgery, identity theft, theft from a motor vehicle, access device fraud, and theft by unlawful taking.

Under information 63-2013, the jury found Appellant guilty of two counts of robbery, three counts of theft by unlawful taking, three counts of receiving stolen property, one count of burglary, one count of criminal trespass, one count of access device fraud, and one count of theft from a motor vehicle.

Under information 1382-2013, the jury found Appellant guilty of one count of robbery, three counts of theft by unlawful taking, three counts of receiving stolen property, one count of burglary,

one count of criminal trespass, one count of access device fraud, and one count of theft from a motor vehicle.

On July 6, 2016, the court sentenced Appellant to an aggregate period of incarceration in a state correctional institution, the minimum of which was 26 years and the maximum of which was 64 years.

Appellant filed post sentence motions in which he challenged the discretionary aspects of sentencing and sought reconsideration of his sentence. He also filed supplemental post sentence motions in which he averred the court erred in granting the Commonwealth's motion to consolidate and in denying his omnibus pretrial motion and motions to dismiss pursuant to Rule 600. . . .

The court denied Appellant's post sentence motions in an opinion and order dated December 12, 2016.

Appellant filed a notice of appeal. [He filed a court-ordered concise statement of matters complained of on appeal in which he raised ten issues.]

Trial Court Opinion, filed May 8, 2017, at 8-10, 10-11, 1-6.

Appellant presents the following questions for our review:

   I.   **DID THE LOWER COURT ERR WHEN IT DENIED APPELLANT'S MOTION FOR A NEW TRIAL AFTER THE COMMONWEALTH VIOLATED PA.R.CRIM.P. 602 WHEN IT FAILED TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT THE APPELLANT'S ABSENCE AT TRIAL WAS WITHOUT GOOD CAUSE?**

   II.  **DID THE LOWER COURT ERR WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS AS LAW ENFORCEMENT OFFICERS LACKED SUFFICIENT PROBABLE CAUSE TO EXECUTE AN ARREST OF APPELLANT ON DECEMBER 20, 2012, AS APPELLANT NEVER LEFT HIS VEHICLE, THE OFFICERS LACKED SUFFICIENT FACTS TO LEAD THEM TO BELIEVE THAT A CRIME WAS IN THE PROCESS OF BEING COMMITTED, [AND,] AS SUCH, ALL EVIDENCE AND**

**ADMISSIONS MADE POST-ARREST SHOULD HAVE BEEN SUPPRESSED?**

III.  **DID THE LOWER COURT ERR WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS AS LAW ENFORCEMENT OFFICERS LACKED A PROPER ARREST WARRANT TO JUSTIFY APPELLANT'S ARREST AND DETENTION?**

IV.  **DID THE LOWER COURT ERR WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS PURSUANT TO A VIOLATION OF PA.R.CRIM.P. 519, BY UNNECESSARILY DELAYING APPELLANT'S APPEARANCE BEFORE A MAGISTRATE DISTRICT JUDGE, HIS UNLAWFUL DETENTION LED TO THE IMPOUNDING OF HIS VEHICLE AND HIS ADMISSIONS, AND THUS ALL POST-ARREST EVIDENCE AND ADMISSIONS SHOULD HAVE BEEN SUPPRESSED?**

V.  **DID THE LOWER COURT ERR WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS AS LAW ENFORCEMENT OFFICERS LACKED SUFFICIENT PROBABLE CAUSE TO SEIZE AND SEARCH APPELLANT'S VEHICLE?**

VI.  **DID THE LOWER COURT ERR WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS AS AGENT KONTZ VIOLATED THE MUNICIPAL POLICE JURISDICTION ACT WHEN HE ARRESTED APPELLANT WITHOUT THE PROPER FILING OF A POLICE COMPLAINT AND OBTAINING AN ARREST WARRANT?**

VII.  **DID THE LOWER COURT ERR WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS SINCE POLICE FAILED TO PROPERLY FILE A CRIMINAL COMPLAINT AND SUBSEQUENT VALID ARREST WARRANT VIOLATED HIS RIGHTS AND HIS CONFESSION TO AGENT KONTZ SHOULD HAVE BEEN SUPPRESSED?**

**VIII. DID THE LOWER COURT ERR WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS AS THE PHOTOGRAPHIC IDENTIFICATION PROCESS USED BY LAW ENFORCEMENT WAS DONE IN AN UNDULY SUGGESTIVE MANNER?**

**IX. DID THE LOWER COURT ERR WHEN IT GRANTED THE COMMONWEALTH'S MOTION TO JOIN THE INFORMATIONS, AS THE CONSOLIDATION UNDULY PREJUDICED APPELLANT AS THE SHEER NUMBER OF CHARGES WOULD LEAD THE JURY TO CONCLUDE APPELLANT HAD A PROPENSITY TO COMMIT CRIME?**

**X. DID THE LOWER COURT ERR WHEN IT DENIED APPELLANT'S MOTION TO DISMISS PURSUANT TO PA.R.CRIM.P. 600, AS MORE THAN THREE-HUNDRED AND SIXTY-FIVE DAYS HAD PASSED SINCE THE FILING OF THE CHARGES AGAINST HIM AND THE DATE OF HIS JANUARY 1, 2016 MOTION FOR DISMISSAL?**

**XI. DID THE LOWER COURT ERR AND ABUSE ITS DISCRETION WHEN IT SENTENCED APPELLANT TO MULTIPLE CONSECUTIVE SENTENCES FOR AN AGGREGATE SENTENCE OF TWENTY-SIX YEARS MINIMUM, WITH A MAXIMUM OF WHICH WAS SIXTY-FOUR YEARS, AS THIS CREATED AN UNDULY HARSH AND MANIFESTLY EXCESSIVE SENTENCE WITHOUT CONSIDERATION OF APPELLANT'S AGE AND REHABILITATIVE NEEDS?**

Appellant's brief, at 17-18.[2]

We have reviewed the certified record, party briefs, controlling law, and the cogent and comprehensive opinion of the Honorable Marc F. Lovecchio,

---

[2] A review of Appellant's argument section shows he provides no argument in support of Questions I, VI, and VII and has, accordingly, abandoned challenges raised therein.

dated May 8, 2017, which we attach to the present memorandum decision.

We conclude that Judge Lovecchio's opinion properly disposes of all issues[3,4]

---

[3] Appellant centers his Rule 600 issue on a theory not presented in his Pa.R.A.P. 1925(b) statement. Specifically, Appellant contends, for the first time in his brief, that were it not for defense counsel's unauthorized decisions to consent to Commonwealth continuances and the corresponding new trial dates set by the court, his final Rule 600 run date would have occurred prior to the start of his trial, in violation of Rule 600. In contrast, his Pa.R.A.P. 1925(b) statement asserts only a generic Rule 600 claim that more than 365 days transpired from the date the Commonwealth filed charges against him. From this general claim, there is no indication that Appellant intended to ask this Court to revisit established precedent attributing defense counsel's Rule 600-related pre-trial decisions to a defendant. We, therefore, find this issue waived. ***See Commonwealth v. Lord***, 719 A.2d 306 (Pa. 1998) ("Any issues not raised in a 1925(b) statement will be deemed waived.")

Even if Appellant had preserved this discrete issue, he asks us to do what we are not empowered to do, namely, "carve out" an exception to a binding decision issued by the Pennsylvania Supreme Court that would in effect swallow the very rule announced therein. In ***Commonwealth v. Wells***, 521 A.2d 1388 (Pa. 1987), our Supreme Court observed that counsel may exercise his or her sound discretion and make informed choices for the defendant with respect to Rule 1100 (now Rule 600). "The actions of counsel in this regard are imputed to the defendant who is bound thereby[,]" the Court held. ***Id***. at 1391. ***Cf Commonwealth v. Baird***, 975 A.2d 1113, 1119 (Pa.Super. 2009) (holding "Superior Court did not err in applying general rule, consistent with federal speedy-trial jurisprudence, attributing notice to counsel to the defendant for Rule 600 purposes). Appellant asks us to impose a new requirement into the Supreme Court's Rule 600 design that would oblige counsel to obtain the specific permission of clients for continuance requests before they are granted. ***See*** Appellant's brief, at 36. Our jurisprudence is well-settled, however, that we are without authority to ignore binding precedent of the Supreme Court. ***See Commonwealth v. Seskey***, 170 A.3d 1105, 1109 (Pa.Super. 2017) (observing "[T]his Court is duty-bound to effectuate our Supreme Court's decisional law.").

Finally, to the extent Appellant's claim may be understood as asserting the ineffectiveness of counsel in failing to secure his speedy trial rights provided under Rule 600, we would deny such a claim without prejudice to Appellant's

Appellant has preserved for review such that we discern no abuse of discretion or error of law below. Accordingly, we adopt Judge Lovecchio's opinion as our own and affirm judgment of sentence on that basis.

Judgment of sentence is AFFIRMED.

Judgment Entered.

*[signature]*

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/22/2018

---

right to raise it on collateral review. ***See Commonwealth v. Grant***, 813 A.2d 726, 738 (Pa. 2002) ("We now hold that, as a general rule, a petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review.").

[4] In his final issue, Appellant raises a challenge to the discretionary aspects of his sentence. It was his obligation, therefore, to provide a separate statement, pursuant to Pa.R.A.P. 2119(f), "specifying where the sentence falls in relation to the Sentencing Guidelines and what particular provision of the Sentencing Code has been violated. The 2119(f) statement must specify what fundamental norm the sentence violates and the manner in which it violates that norm." ***Commonwealth v. Johnson***, 873 A.2d 704, 708 (Pa.Super. 2005) (internal citations omitted). Appellant's Rule 2119(f) statement simply declares that a "substantial question exists as the lower court sentenced to consecutive sentences without proper consideration of Appellant's rehabilitative [sic] and his age."

Had the Commonwealth objected to Appellant's boilerplate Rule 2119(f) statement, we would have found the statement does not satisfy the minimum requirements of the rule, as it would force this Court to review the argument section of Appellant's brief to determine whether a substantial question as to the propriety of his sentence exists. However, because the Commonwealth failed to object, and Appellant states his claim with sufficient specificity in the argument section of his brief, we decline to find waiver on this basis. ***See Id***.

IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

COMMONWEALTH        : No. CR-17-2013
                                  :       CR-35-2013

vs.                        :       CR-63-2013
                                    :       CR-1382-2013
                                    :

REUBEN McDOWELL,      :
Appellant             : 1925(a) Opinion

**OPINION IN SUPPORT OF ORDER IN
COMPLIANCE WITH RULE 1925(a) OF
THE RULES OF APPELLATE PROCEDURE**

This opinion is written in support of this court's judgment of sentence dated

July 6, 2016, which became final when the court denied the appellant's post-sentence motion.

The relevant facts follow.

In CR-17-2013, Trooper Matthew Sweet filed a criminal complaint against

Appellant Reuben McDowell (hereinafter "McDowell") on December 20, 2012, charging

McDowell with assault, burglary, robbery, criminal trespass, stalking, theft, receiving stolen

property, simple assault, recklessly endangering another person and harassment.

The charges relate to an incident involving Jean Heller, an 86 year old female.

On December 12, 2012, she went to the Giant Shopping Center in Loyalsock to buy

groceries. She returned to her house at approximately 1:00 p.m. While in the process of

bringing her groceries into the house from her car, she noticed the handle on the front door

being moved. Thinking it was the mailman, she went to open the door, but was pushed back

and fell on the floor. The intruder kicked the victim several times, located her purse, took her

1



wallet and an envelope containing cash, and then left the home. Through the use of a photo lineup or array on December 20, 2012, the victim identified McDowell as the individual who robbed her.

In CR-35-2013, Trooper Sweet filed a criminal complaint against McDowell on December 21, 2012, charging McDowell with forgery, identity theft, theft from a motor vehicle, access device fraud, and theft by unlawful taking. Under this Information, Peggy Econumou, an 86 year old female, was grocery shopping at Aldi's in Loyalsock Township on December 12, 2012. While she was returning the shopping cart, McDowell stole her purse from her vehicle. Among the items taken from the purse was a credit card, which was subsequently used at Weis Markets. The surveillance video from Weis Markets showed an African American individual with sunglasses, a black hat and black coat. Similar clothing was eventually seized from a vehicle McDowell was operating. Furthermore, a subsequent search of McDowell's residence, pursuant to a search warrant, yielded items that were purchased on December 13 with the victim's credit card. Moreover, when McDowell was taken into custody, he admitted to the crimes. Specifically, he told police officers that while the victim was returning her cart, he saw an opportunity to take the purse. He removed it from the car and ultimately used the credit card at various locations.

In CR-62-2013, Agent Raymond Kontz, III, of the Williamsport Bureau of Police, filed a criminal complaint against McDowell on December 31, 2012, charging him with robbery, theft by unlawful taking, receiving stolen property, recklessly endangering another person, simple assault, and theft from a motor vehicle. The crimes arose out of an incident on December 7, 2012. On December 7, 2012, while returning from grocery

2

shopping, eighty-two year old Mary Mulauski stopped to check the movie times at the Williamsport Cinema Center. She came in contact with an individual as she was getting into her car. A struggle ensued when her assailant was attempting to take the purse. The assailant eventually obtained the purse after pressing a pressure point on the victim's hand. On December 22, 2012, the victim identified McDowell as the perpetrator from a photo array.

While subsequently in custody, McDowell admitted that he saw the victim in the parking lot area and acknowledged that she was older. He thought that he could take her purse without having to confront her but was surprised when she fought.

In CR-1382-2013, the police filed a criminal complaint against McDowell on February 13, 2013, charging him with robbery, stalking, theft by unlawful taking, receiving stolen property, harassment, burglary, criminal trespass, access device fraud and theft from a motor vehicle. The crimes were alleged to have occurred between December 9, 2012 and December 16, 2012. During that span of time, four more women in their eighties had their purses stolen from their person or their residence after shopping at either the Wegman's, Aldi's or Giant grocery stores.

The first was Alice Frei. In December of 2012 after returning to her home from the library and while trying to get into her apartment an individual grabbed her purse, stole it, ran to his car and drove away. Ms. Frei was 85 years old and resided in Williamsport. She had previously been shopping at the Wegman's grocery store in Williamsport.

On December 11, 2012 at approximately noon, Margaret Campbell, then 83 years old was unloading groceries. She had been previously shopping at the Giant in Loyalsock. While putting away her groceries, she placed her purse on a chair inside her front

3

door. After she had put all of the groceries on the table, she started looking for her purse, but it was gone. It was eventually returned to her a few hours later by a third party who indicated that it was found on the road "not too far." The cash in the purse had been taken.

A few hours later, at approximately 4:30 in the afternoon, an assailant entered the residence of Marthena Edkin, an 84 year old female who also resided in the Loyalsock area, shortly after she returned home from the Giant grocery store. The assailant stole money from Ms. Edkin's purse, which was on the kitchen counter.

On December 16, 2012 at approximately 4:00 in the afternoon Delores Montgomery, an 82 year old female, had her purse stolen from out of her vehicle at the Aldi's parking lot. She was returning her cart to the designated cart collection area. She observed the actor removing her purse and fleeing in a vehicle. Her purse was found nearby her residence and returned to her. Her credit cards had been used.

A jury trial was held March 14-18, 2016.

Under information 17-2013, the jury found McDowell guilty of burglary, robbery, criminal trespass, stalking, theft by unlawful taking, receiving stolen property, simple assault and recklessly endangering another person.

Under information 35-2013, the jury found McDowell guilty of forgery, identity theft, theft from a motor vehicle, access device fraud, and theft by unlawful taking.

Under information 63-2013, the jury found McDowell guilty of two counts of robbery, three counts of theft by unlawful taking, three counts of receiving stolen property, one count of burglary, one count of criminal trespass, one count of access device fraud, and one count of theft from a motor vehicle.

4

Under information 1382-2013, the jury found McDowell guilty of one count of robbery, three counts of theft by unlawful taking, three counts of receiving stolen property, one count of burglary, one count of criminal trespass, one count of access device fraud, and one count of theft from a motor vehicle.

On July 6, 2016, the court sentenced McDowell to an aggregate period of incarceration in a state correctional institution, the minimum of which was 26 years and the maximum of which was 64 years.

McDowell filed post sentence motions in which he challenged the discretionary aspects of sentencing and sought reconsideration of his sentence. He also filed supplemental post sentence motions in which he averred the court erred in granting the Commonwealth's motion to consolidate and in denying his omnibus pretrial motion and motions to dismiss pursuant to Rule 600 for the following reasons: (a) the officers lacked sufficient probable cause to arrest him on December 20, 2012 since he never left his vehicle; (b) the officers lacked a proper arrest warrant to justify his arrest and detention; (c) law enforcement violated Rule 519 by unnecessarily delaying his appearance before a Magisterial District Judge which led to the impounding of his vehicle and his admissions; (d) law enforcement lacked probable cause to seize and search his vehicle; (e) Agent Kontz violated the Municipal Police Jurisdiction Act when Agent Kontz arrested him without the proper filing of a police complaint and obtaining an arrest warrant; (f) the lack of a properly filed complaint and lack of a valid arrest warrant violated his rights such that his confession to Agent Kontz should have been suppressed; (g) the photographic identification process used by law enforcement was done in an unduly suggestive manner; (h) the consolidation unduly

prejudiced him as the sheer number of charges would lead the jury to conclude he had a propensity to commit crimes; and (i) the court erroneously found that the period of delay between February 19, 2013 and August 27, 2013 was excludable time since he never consented to his counsel's requests for continuances.

The court denied McDowell's post sentence motions in an opinion and order dated December 12, 2016.

McDowell filed a notice of appeal. In his concise statement of matters complained of on appeal, McDowell asserts the following issues:

1. The lower court erred when it denied [McDowell's] motion to suppress as law enforcement officers lacked sufficient probable cause to execute an arrest of [McDowell] on December 20, 2012, as [McDowell] never left his vehicle, the officers lacked sufficient facts to lead them to believe that a crime was in the process of being committed, as such, all evidence and admissions made post-arrest should have been suppressed.

2. The lower court erred when it denied [McDowell's] motion to suppress as law enforcement officers lacked a proper arrest warrant to justify [McDowell's] arrest and detention.

3. The lower court erred when it denied [McDowell's] motion to suppress pursuant to a violation of Pa.R.Crim.P. 519, by unnecessarily delaying [McDowell's] appearance before a [Magisterial] District Judge, his unlawful detention led to the impounding of his vehicle and his admissions, and thus all post-arrest evidence and admissions should have been suppressed.

4. The lower court erred when if denied [McDowell's] motion to suppress as law enforcement officers lacked sufficient probable cause to seize and search [McDowell's] vehicle.

5. The lower court erred when it denied [McDowell's] motion to suppress as Agent Kontz violated the Municipal Police Jurisdiction Act when he arrested [McDowell] without the proper filing of a police complaint and obtaining an arrest warrant.

6. The lower court erred when it denied [McDowell's] motion to

6

suppress since police failed to properly file a criminal complaint and subsequent valid arrest warrant violated his rights and his confession to Agent Kontz should have been suppressed.

7. The lower court erred when it denied [McDowell's] motion to suppress as the photographic identification process used by law enforcement was done in an unduly suggestive manner.

8. The lower court erred when it granted the Commonwealth's motion to join the informations, as the consolidation unduly prejudiced [McDowell] as the sheer number of charges would lead the jury to concluded [McDowell] had a propensity to commit crime.

9. The lower court erred when it denied [McDowell's] motion to dismiss pursuant to Pa. R. Crim. P. 600, as more than three-hundred and sixty-five days had passed since the filing of the charges against him and the date of his January 1, 2016 motions for dismissal.

10. The lower court erred and abused its discretion when it sentenced [McDowell] to multiple consecutive sentences for an aggregate sentence of twenty-six years minimum, with a maximum of which was sixty-four years, as this created as unduly harsh and manifestly excessive sentence without consideration of [McDowell's] age and rehabilitative needs.

McDowell first asserts that the court erred in denying his suppression motion because the police lacked sufficient probable cause to arrest him on December 20, 2012. McDowell represented himself at the suppression hearings. He asserted that the police lacked probable cause for the following reasons: (1) the arrest was not verified by a filed police report or affidavit of probable cause; (2) he was never charged with a crime against the alleged victim for his conduct on December 20, 2012 on Hidden Valley Drive; (3) Trooper Sweet did not have the authority to make the probable cause decision; rather it had to come from a senior law enforcement officer on the scene; and (4) Trooper Sweet's testimony was not credible. The court rejected each of these assertions.

7

Trooper Matthew Sweet of the Pennsylvania State Police testified on five different occasions including November 17, 2014; December 30, 2014; February 6, 2015; March 23, 2015; and July 8, 2015.

On or about December 12, 2012, Trooper Sweet was assigned to investigate several recent robberies. He reviewed reports of some of the incidents and actually responded to the Heller incident. He developed some leads regarding the suspect and his vehicle (black male driving a silver/goldish/beige mid-sized SUV). He further identified a modus operandi (MO) of the suspect (robbing elderly women coming from or participating in shopping).

On December 13, 2012, he along with several other troopers began a surveillance detail. The surveillance team conducted surveillance from December 13, 2012 to December 15, 2012 and from December 17, 2012 to December 20, 2012. As the investigation proceeded, more leads were developed. The description of the possible suspect became more defined (black male, stocky, broad chested, bald, middle aged or elderly, clean shaven). As well, it appeared that certain stores or shopping centers were targeted including the Giant Plaza, Wegmans, and Aldi's. Further, the crimes would "generally" occur when the victims were either returning to their vehicles after shopping or returning home. As well, the suspect had used force in at least some of the incidents. Some of the victims were "attacked" within a minute or two of returning home. Others were outside while some had actually been inside their homes. Most of the crimes occurred between the late morning and approximately 5:00 p.m. All of the alleged victims were women in their 80's. Videos and pictures from surveillance cameras were obtained and viewed. A Lycoming College surveillance camera depicted the suspect vehicle as a gold colored SUV. A Weis Market surveillance camera

depicted the suspect. A picture was obtained of a suspect using a victim's stolen credit card. The suspect as viewed matched the description as given by the victims.

On December 20, 2012 at approximately 2:00 p.m., Troopers Sweet and Holmes were conducting undercover surveillance at the Giant Plaza. They observed McDowell pull his vehicle, a gold/ beige colored SUV, in front of their vehicle. McDowell was "acting very suspicious." He kept pulling in and out of various parking stalls. He was looking around and appeared very nervous. It "appeared to [the troopers] that he was looking for a potential victim."

McDowell eventually pulled his vehicle in front of an elderly woman, later identified as Mrs. Bendorf, who was putting some of her groceries or merchandise in her vehicle. As soon as Mrs. Bendorf got in her vehicle and pulled out of the parking lot, McDowell followed her. He followed Mrs. Bendorf "up to basically her residence." According to Trooper Sweet, "Every move she made, he made." As Mrs. Bendorf turned onto the roadway to her residence, Hidden Valley Drive, McDowell turned onto an adjacent roadway, Fairview Drive, in very close proximity to Mrs. Bendorf's residence and backed into a driveway. Trooper Sweet opined that McDowell was observing Mrs. Bendorf. He was parked in "a very close vicinity." "It's basically across a tree line up to a residential area." McDowell then left the area, drove a few miles away, and then returned within minutes, this time actually driving up Hidden Valley Drive, which ends in a cul de sac.

McDowell drove past Mrs. Bendorf's house. He turned around in the driveway of a residence one house away and traveled back down toward Mrs. Bendorf's house. Mrs. Bendorf was still carrying groceries into her house with her trunk still open. The troopers

9

blocked the roadway, surrounded McDowell's vehicle and, with guns drawn, ordered McDowell out of his vehicle. McDowell did as directed. He was removed from his vehicle and immediately taken into custody. He was handcuffed and placed in a patrol unit.

The troopers were concerned that McDowell was going to rob Mrs. Bendorf. The troopers believed that McDowell "was in the commission of a crime or attempting to commit a crime."

Trooper Sweet specifically took McDowell into custody "based on probable cause of a felony." Specifically, "for the Heller case, [and] for all the other additional cases" that Trooper Sweet was investigating. As well, there was probable cause to believe that with respect to Mrs. Bendorf there was criminal activity afoot, mainly an attempted robbery. According to Trooper Sweet, McDowell's activities that day "caused his arrest."

After being transported to the state police barracks, McDowell was held for processing and then brought to an interview room. While at the barracks and after being Mirandized, the troopers questioned McDowell regarding his conduct that day. The troopers did not believe that he was being truthful. As well, McDowell was confronted with evidence linking him to some of the other incidents including the Lycoming College surveillance video and a printout of certain purchases made on a stolen credit card.

After McDowell was transported to the barracks, Trooper Sweet and others continued their investigation. Among other things, they interviewed McDowell; typed up search warrants for the vehicle he was driving, his residence and his phone; spoke with some of the victims from the prior incidents; spoke briefly with Mrs. Bendorf; prepared photo arrays; met with at least two prior victims who viewed the photo arrays and identified

10

McDowell from the photo arrays as the perpetrator of the crimes against them; reviewed the investigative reports from the other incidents; conducted an inventory search of the car; obtained and executed a search warrant at McDowell's residence; conversed with the assistant district attorney on call; and typed up charges.

The search warrant was executed on McDowell's residence at approximately 10:00 p.m. Numerous incriminating items were seized. The vehicle McDowell had been driving was towed to the PSP impound for processing. A custodial inventory search was initially conducted. A search warrant for the vehicle was obtained that day but not executed until the following day. The two searches of the vehicle uncovered several items of significance incriminating McDowell.

During extensive cross-examination, Trooper Sweet clarified the probable cause to arrest McDowell on December 20, 2012. It was based on "everything that [they] gathered throughout the investigation, modus operandi." They watched McDowell "stalking" an elderly woman and follow her home. Trooper Sweet believed that an attempted robbery was afoot. As well, Trooper Sweet testified that he had probable cause to arrest McDowell for the crimes that "occurred previous to the day in question." Those crimes occurred on December 7th, 9th, 11th, 12th, and 16th.

According to Trooper Sweet, there was probable cause based on all of the ongoing investigations of several robberies that McDowell was the gentlemen involved in the robberies and they were able to take McDowell into custody based on the probable cause of a felony for those crimes that had occurred previous to the day in question. As well, the troopers observed McDowell following an elderly woman back from the grocery store.

11

Despite the fact that McDowell didn't get out of the vehicle, the troopers probably could have charged him stalking or something else, but they decided not to, because they had numerous other violations that they were dealing with.

Trooper Sweet testified that no charges were filed against McDowell with respect to Mrs. Bendorf because she did not want "to be a victim" and the District Attorney's office "didn't feel there was a substantial step taken…to approve a charge of attempted robbery."

McDowell argued that Trooper Sweet's testimony was not credible. Candidly, the court found that McDowell was splitting hairs on insignificant issues. For example, McDowell argued that Trooper Sweet was not credible because the affidavit of probable cause noted that McDowell was observed following Mrs. Bendorf to "the area of her residence" when in fact he did not initially drive on Hidden Valley Road but on the adjacent roadway. The distinctions and differences that McDowell drew in connection with the statements by Trooper Sweet and others did not impact on the court's assessment of Trooper Sweet's credibility. The court found the testimony of Trooper Sweet credible.

McDowell argued that probable cause did not exist to arrest him, because no criminal complaint was filed against him in connection with the Bendorf incident. He did not, and could not, however, point to any legal authority that vitiates probable cause to arrest when subsequent criminal charges are not filed via an affidavit of probable cause and criminal complaint.

McDowell argued as well that he could not be subsequently detained after it was decided that charges would not be brought against him in connection with the Bendorf

12

incident. The court found, however, that his argument lacked merit. First, the decision not to charge McDowell with any crimes associated with the Bendorf incident was not made until many days later. As Trooper Sweet testified, the decision not to file "on Bendorf" was made "later on down the road." McDowell was still being be detained on those potential charges. As well, he was being detained on the other charges as testified to by Trooper Sweet. Those charges were actually filed against him. McDowell was charged and arraigned within approximately eight hours in connection with the Heller incident. Trooper Sweet decided to file the Heller charges first because she positively identified him.

McDowell also asserted that when he was arrested on December 20, 2012, there was insufficient probable cause.

> Probable cause to arrest exists when the facts and circumstances within the police officer's knowledge and of which the officer has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested. Probable cause justifying a warrantless arrest is determined by the totality of the circumstances.

*Commonwealth v. Weaver*, 76 A.3d 562, 565 (Pa. Super. 2013), quoting *Commonwealth v. Williams*, 941 A.2d 14, 27 (Pa. Super. 2008).

The court must view the totality of the circumstances as seen through the eyes of a trained officer, and not as an ordinary citizen would view them. *Commonwealth v. Nobalez*, 805 A.2d 598, 600 (Pa. Super. 2002), appeal denied, 835 A.2d 709 (Pa. 2003). It is only the probability, and not a prima facie showing of criminal activity that is the standard of probable cause. *Commonwealth v. Thompson*, 604 Pa. 198, 985 A.2d 928, 931 (2009). Probable cause exists when criminality is one reasonable inference; it need not be the only

13

inference. *Commonwealth v. Burnside*, 625 A.2d 678, 681 (Pa. Super. 1993). "Furthermore, probable cause does not involve certainties, but rather the factual and practical considerations of everyday life on which reasonable and prudent persons act." *Commonwealth v. Simmen*, 58 A.3d 811, 817 (Pa. Super. 2012), citing *Williams*, supra.

The court found that contrary to what McDowell claimed, Trooper Sweet had sufficient probable cause to arrest McDowell for the conduct involving Mrs. Bendorf.

Generally speaking, a burglary is an unauthorized entry with intent to commit a crime after that entry. *Commonwealth v. Alston*, 539 Pa. 202, 651 A.2d 1092, 1094 (1994). Like all other crimes, the elements of burglary may be proved by circumstantial evidence. *Commonwealth v. Tessel*, 347 Pa. Super. 37, 500 A.2d 144, 147 (1985).

Robbery generally consists of forcibly taking from another person money or goods of any value by means of force, violence or putting that other person in fear. See *Commonwealth v. Natividad*, 565 Pa. 348, 773 A.2d 167, 176 (2001), cert. denied, 535 U.S. 1099, 122 S. Ct. 2300 (2002).

Theft generally is the unlawful taking or exercising control over the movable property of another person with the intent to deprive that person of said property. *Commonwealth v. Crawford*, 285 Pa. Super. 169, 427 A.2d 166, 170 (1981).

An attempt generally is the intention to commit an offense and the taking of a substantial step toward completion of that offense. *Commonwealth v. Henley*, 504 Pa. 408, 474 A.2d 1115, 1118 (1984).

Trooper Sweet had probable cause to believe that McDowell was in the course of committing a burglary, robbery, theft and/or attempt to commit any of those offenses

14

against Mrs. Bendorf.

Prior to the incident, a handful of elderly women were robbed, burglarized or stolen from while shopping or returning home from shopping. The MO of all of the crimes was the same. The perpetrator would identify the elderly woman and then either take the items immediately or follow the victim home and then take the items either surreptitiously or forcibly. The individual who committed the crimes was a black male, stocky, middle-aged and clean shaven. The perpetrator was also driving a gold, tan, and/or beige mid-size SUV.

On the date McDowell was arrested, he was seen entering the parking lot of a shopping center. He was moving his vehicle to different stalls, looking around and acting suspiciously. At no time did he park his vehicle and go into a store.

As Mrs. Bendorf was arriving at her vehicle alone and obviously elderly, McDowell pulled his vehicle near her. He then followed her vehicle in his vehicle. McDowell and his vehicle matched the prior descriptions of the suspect and suspect's vehicle.

McDowell followed Mrs. Bendorf over different roadways eventually to the area of her home. He pulled off beforehand in a position which gave him an opportunity to notice where she lived and to observe what she was doing. He did not have any apparent reason to be in that area. He did not stop at any houses nor visit any businesses.

He then left the area, drove away, turned around in a few minutes and then returned. When he returned, he actually drove his vehicle on the roadway on which Ms. Bendorf's house was located. At the time, she was alone removing groceries from her vehicle with the trunk open. He passed her house and then turned around, at which time he was stopped and arrested.

Certainly, the totality of these circumstances as seen through the eyes of Trooper Sweet indicated the probability of criminal activity.

Additionally, the court found that there was probable cause to arrest McDowell in connection with the previous incidents. Prior to this incident, there were a handful of separate incidents involving seven separate victims of similar burglary/robbery/theft related crimes. There was a similar physical description of the perpetrator and a similar vehicle description. The MO was virtually identical. McDowell, as the perpetrator, identified an elderly woman and then committed the crimes by taking items either surreptitiously or by force. The police had at least partial identifying information from all of the victims, surveillance footage, still pictures and purchase receipts which all pointed to McDowell as the "probable" perpetrator.

McDowell next asserts that the trial court erred when it denied his motion to suppress as law enforcement officers lacked a proper arrest warrant to justify his arrest and detention. The court rejected this assertion because a police officer is authorized to arrest without a warrant in many situations, including upon probable cause when the offense is a felony or when the offense is a felony or misdemeanor committed in the presence of the officer making the arrest. Pa. R. Crim. P. 502 (2); see also *Commonwealth v. Zook*, 615 A.2d 1, 6 (Pa. 1992)("A police officer may arrest without a warrant where there is probable cause to believe that a felony has been committed and that the arrestee is the felon.").

McDowell also contends the lower court erred when it denied his motion to suppress pursuant to a violation of Pa.R.Crim.P. 519.

Rule 519 (A) of the Pennsylvania Rules of Criminal Procedure requires that a

16

defendant arrested without a warrant be preliminarily arraigned without unnecessary delay. The purpose behind the Rule is to prevent coercive interrogation, protect a defendant's right to be free from unreasonable seizure of his person and ensure a defendant is afforded the constitutional rights protected by Rule 540. See *Commonwealth v. Perez*, 577 Pa. 360, 845 A.2d 779, 782-83 (2004).

Trooper Sweet testified that once McDowell was taken into custody there were several things going on. Search warrants were being prepared, submitted for approval and then executed. Charges were being typed up, witnesses were being interviewed, McDowell was being interviewed, photo line-ups were shown to victims and eventually the charges were filed and Defendant was arraigned.

In this case, there was no unreasonable delay, no misconduct by the police, no coercion of McDowell, no dilatory conduct and no arbitrary delay.

McDowell contends the court erred when it denied his motion to suppress as law enforcement officers lacked sufficient probable cause to seize and search his vehicle.

In *Commonwealth v. Gary*, 625 Pa. 183, 91 A.3d 102 (2014), the Pennsylvania Supreme Court aligned Pennsylvania law regarding warrantless searches of automobiles with the federal law and held that the only prerequisite for a warrantless search of a motor vehicle is probable cause.

The police had probable cause to believe that McDowell was the individual who had been robbing elderly women and stealing their purses in December 2012. They also had probable cause to believe that evidence of those crimes could be found in the vehicle McDowell was driving. McDowell and the vehicle he was driving matched the descriptions

of the perpetrator and his vehicle given by the victims of the robberies and thefts. The victims described the perpetrator as a bald, middle-aged African American male who was driving a gold, tan or beige SUV. McDowell is a bald, middle-aged African American male who was driving a Hyundai Tuscon SUV. The prior offenses occurred between December 7th and December 16th, merely days before the police stopped McDowell's vehicle. McDowell's conduct led the police to believe that he was about to rob or steal from his next victim when he went from one parking stall to another in the Giant parking lot, followed Ms. Bendorf home, watched her from a nearby street, left briefly and returned to her street. Under all the facts and circumstances of this case, it was reasonable for the police to believe that evidence of the prior offenses would be found within McDowell's vehicle.

Even if the search and seizure of the vehicle is analyzed under the law as it existed at the time of the stop, the seizure of the vehicle McDowell was driving was not illegal.

> The authority of the police to impound vehicles comes from their reasonable community caretaking functions. Such functions include removing disabled or damaged vehicles from the highway, impounding automobiles which violate parking ordinances (thereby jeopardizing public safety and efficient traffic flow), and protecting the community's safety.

*Commonwealth v. Lagenella*, 623 Pa. 434, 83 A.3d 94, 103 (2013), citing *Commonwealth v. Henley*, 909 A.2d 352, 359 (Pa. Super. 2006)(en banc). A warrantless seizure of an automobile is permissible after the driver has been placed into custody, the vehicle is located on public property and where there exists probable cause to believe that evidence of the commission of a crime will be obtained from the vehicle. *Commonwealth v. Holzer*, 480 Pa. 93, 389 A.2d 101, 106 (1978); see also *Commonwealth v. Milyak*, 508 Pa. 2, 493 A.2d 1346,

18

1349 (1985).

In this particular case, all of those requirements were met. McDowell was placed into custody, the vehicle was located on public property, and there existed probable cause to believe that evidence of a crime would be found in the vehicle. The vehicle had been probably utilized in connection with several prior incidents. Contrary to McDowell's assertion, there does not appear to be any requirement that the owner of the vehicle be contacted prior to the vehicle being towed.

Moreover, a valid search warrant was obtained and executed on the vehicle the following day. The evidence would have been lawfully seized pursuant to that search warrant. Therefore, in the alternative, the court denied McDowell's motion to suppress based on the "inevitable discovery" rule. *Commonwealth v. Anderson*, 40 A.3d 1245, 1249 n.6 (Pa. Super. 2012)(evidence is admissible under the inevitable discovery rule when the Commonwealth demonstrates that the evidence would have inevitably been discovered through lawful means).

McDowell next asserts that the court erred when it denied his motion to suppress as Agent Kontz violated the Municipal Police Jurisdiction Act when he arrested McDowell without the proper filing of a police complaint and obtaining an arrest warrant. This allegation of error appears to commingle two separate issues, i.e., whether Agent Kontz lawfully arrested McDowell outside of his primary jurisdiction and whether Agent Kontz lawfully arrested McDowell without first filing a criminal complaint and obtaining an arrest warrant.

The court found that Agent Kontz' actions did not violate the Municipal

19

Police Jurisdiction Act, 42 Pa.C.S.A. §8953.

The Municipal Police Jurisdiction Act permits officers to act outside of their primary jurisdiction in certain circumstances. The Act states, in relevant part:

> Any duly employed municipal police officer who is within this Commonwealth, but beyond the territorial limits of his primary jurisdiction, shall have the power and authority to enforce the laws of the Commonwealth or otherwise perform the functions of that office as if enforcing those laws or performing those functions within the territorial limits of his primary jurisdiction in the following cases: ...
>
> (3) Where the officer has been requested to aid or assist any local, State or Federal law enforcement official or park police officer or otherwise has probable cause to believe that the other officer is in need of aid or assistance.
>
> (4) Where the officer has obtained the prior consent of the chief law enforcement officer, or a person authorized by him to give consent, of the organized law enforcement agency which provides primary police services to a political subdivision which is beyond that officer's primary jurisdiction to enter the other jurisdiction for the purpose of conducting official duties which arise from official matters within his primary jurisdiction.

42 Pa.C.S.A. §8953(a)(3) and (4). This Act is to be liberally construed to effectuate its purposes, one of which is to provide police officers with authority to make arrests outside of their primary jurisdiction with the consent of the law enforcement agency where the person being arrested is located or being held. See *Commonwealth v. Ebersole*, 492 A.2d 436 (Pa. Super. 1985).

Agent Kontz went to the State Police barracks after he received a phone call from the State Police. The State Police were aware that Agent Kontz and the Williamsport police were also looking for a middle-aged African American male for a similar crime that occurred in their jurisdiction. Therefore, Agent Kontz did not venture outside of his primary jurisdiction on his own to arrest McDowell, but rather he was invited by law enforcement that

20

had jurisdiction. Accordingly, the court found that there was no violation of the Municipal Police Jurisdiction Act under the facts and circumstances of this case.

Furthermore, assuming for the sake of argument that there was a violation of the Act, suppression would not be an appropriate remedy in this case. See *Commonwealth v. O'Shea*, 567 A.2d 1023, 1030 (Pa. 1989); *Commonwealth v. Sestina*, 546 A.2d 109, 112 (Pa. Super. 1988); *Commonwealth v. Peppers*, 515 A.2d 971, 972-73 (Pa. Super. 1986).

Whether suppression is an appropriate remedy for a violation is determined on a case-by-case basis depending on the circumstances of the case, including the intrusiveness of the police conduct, the extent of deviation from the letter and spirit of the Act, and the prejudice to the accused. *O'Shea*, *id*. Suppression would not be an appropriate remedy in this case because Agent Kontz was invited by the State Police to come to the barracks and take custody of McDowell.

As previously discussed in this opinion, a police officer who has probable cause to believe that an individual has committed a felony may arrest that individual without a warrant. Pa.R.Crim.P. 502(2)(b); *Commonwealth v. Zook*, 615 A.2d 1, 6 (Pa. 1992)("A police officer may arrest without a warrant where there is probable cause to believe that a felony has been committed and that the arrestee is the felon.").

Agent Kontz was the prosecuting officer for the incident that occurred at the Williamsport Cinema Center on December 7, 2012. While returning from grocery shopping, an eighty-two year old woman stopped to check the movie times at the Williamsport Cinema Center. She came in contact with an individual as she was getting into her car. A struggle ensued when her assailant was attempting to take the purse. The assailant eventually obtained

21

the purse after pressing a pressure point on the victim's hand.

Taking property from a person by force is a robbery. 18 Pa.C.S.A. §3701(a)(v). A robbery is a felony offense. 18 Pa.C.S.A. §3701(b). McDowell met the description of the woman's assailant. Therefore, Agent Kontz had probable cause to believe that McDowell committed the felony offense of robbery, and he could lawfully arrest him without first filing a criminal complaint and obtaining an arrest warrant.

McDowell also alleges that the trial court erred when it denied his motion to suppress as the photographic identification process used by law enforcement was done in an unduly suggestive manner. During the pretrial proceedings, McDowell argued that at no point did the police ever tell the alleged victim that the suspect may or may not be in the photos. He also argued that the alleged victim was never advised that the investigation would continue whether or not an identification was made or that the alleged victim should not feel compelled to even make an identification.

A photo array is unduly suggestive if under the totality of the circumstances, the identification procedure creates a substantial likelihood of misidentification. *Commonwealth v. DeJesus*, 580 Pa. 303, 860 A.2d 102, 112 (2004). Photographs used in line-ups are not unduly suggestive if the suspect's picture does not stand out more than those of others, and the people depicted exhibited similar facial characteristics. *Commonwealth v. Crork*, 966 A.2d 585, 589 (Pa. Super. 2009). "It is only where the identification procedure is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification that suppression will result." *Commonwealth v. Burton*, 770 A.2d 771, 782 (Pa. Super. 2001).

22

Trooper Wool testified in depth regarding the photographic identification of McDowell via the array. The fact that he did not ask or address the victims per McDowell's contentions is not determinative. There was nothing about the photo arrays which were at all suggestive, let alone unduly suggestive. All of the individuals in the photo array were of the same race, had similar coloring, and had similar facial hair and other characteristics as McDowell. Furthermore, nothing was said to the victims that suggested anything. Since the photographic array was not unduly suggestive, McDowell was not entitled to suppression.

McDowell next contends that the trial court erred when it granted the Commonwealth's motion to join the informations. He contends the consolidation unduly prejudiced him as the sheer number of charges would lead the jury to conclude McDowell had a propensity to commit crimes.

Separate informations may be tried together if " (a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or (b) the offenses charged are based on the same act or transaction." Pa. R. Crim. P. 582. Conversely, the court may order separate trials of offenses if it appears that any party may be prejudiced by the offenses being tried together. Pa. R. Crim. P. 583.

The Pennsylvania Supreme Court has established a three-part test for addressing consolidation or severance motions. First, the court must determine whether the evidence of each offense would be admissible in a separate trial for the other. Second, the court must determine whether such evidence is capable of separation by the jury so as to avoid confusion. Third, if the first two questions are answered in the affirmative, the court

23

must determine if the defendant will be unduly prejudiced by the consolidation of the offenses. ***Commonwealth v. Collins***, 550 Pa. 46, 703 A.2d 418, 422 (1997), *cert denied*, 525 U.S. 1015, 119 S. Ct. 538 (1998).

In determining whether the evidence of each offense would be admissible in a separate trial for the other, the court was guided by the Pennsylvania Rules of Evidence, which permit the introduction of "other crimes" evidence to show motive, intent, absence of mistake or accident, common scheme or plan, or identity. Pa. R. Crim. P. 404(b)(2); ***Commonwealth v. Dozzo***, 991 A.2d 898, 902 (Pa. Super 2010)(citations omitted).

Evidence of other crimes is admissible when it tends to prove a common scheme or plan involving two or more crimes so related to each other that proof of one tends to prove the others. ***Commonwealth v. Judd***, 897 A.2d 1224, 1231-32 (Pa. Super 2006). Factors to be considered in establishing similarities include: (1) the elapsed time between the crimes, (2) the geographical proximity of the crime scenes, and (3) the manner in which the crimes were committed. Id. at 1232 (citations omitted).

As well, evidence of other crimes may be introduced to establish the identity of the person charged with commission of the crime on trial. ***Commonwealth v. Armstrong***, 74 A.3d 228, 233 (Pa. Super. 2013). The evidence may be introduced

> where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other…
>
> \* \* \*
>
> The Commonwealth must show more than the other crimes were of the same class for which the defendant is be tried, rather, there must be such a high correlation in the details of the crime that proof that the defendant committed one makes it very unlikely that anyone else but the defendant

24

committed the others."

*Id.*, quoting **Commonwealth v. Morris**, 493 Pa. 164, 425 A.2d 715, 720-21 (1981).

After reviewing all of the evidence, the court concluded that not only were the offenses so similar that they tended to show a common scheme or plan but they also demonstrated that it was very unlikely that anyone else but McDowell committed the other crimes. The crimes were not only of a similar class but they also took place in close temporal and geographic proximity.

McDowell targeted elderly women by positioning himself in the area of grocery stores where elderly women frequent. He waited for the appropriate opportunity -- either in a parking lot, at the victim's vehicle or at her home -- to take what he wanted. In each of the incidents he took the victim's purse, removed items that he deemed valuable, and then discarded the rest. McDowell used only the amount of force necessary to obtain what he wanted and then he left.

The incidents occurred within a ten-day span, well within "acceptable remoteness standards" for consolidation purposes. **Commonwealth v. Robinson**, 581 Pa. 154, 192, 864 A.2d 460, 482 (2004). Geographically, all of the burglaries took place in Williamsport within, at most, a few miles of each other.[1] Different groups of them were at the same location. They all occurred in either the center city or the Loyalsock area of Williamsport.

The manner in which the crimes were committed is sufficiently similar to warrant consolidation. See Commonwealth v. O'Brien, 836 A.2d 966, 970-71 (Pa. Super.

---

[1] The Aldi's and Giant stores are within two blocks of each other. Wegmans and the Cinema Center are within two blocks of each other. The distance between these two groups of establishments is, at most, a few miles.

25

2003). The shared similarities in the perpetration of the crimes, the similar locations, and their temporal proximity show a common scheme or plan. See *Commonwealth v. Newman*, 528 Pa. 393, 598 A.2d 275, 278 (1991).

Moreover, the similarities tended to establish the identity of the perpetrator. This was especially true in light of McDowell's admission that he committed some of the offenses. There was such a logical connection between the crimes that proof of one naturally tended to show that the accused is the person who committed the other. Indeed, given the similarities of the crimes and the descriptions of the perpetrator and his vehicle, it is very unlikely that anyone else but McDowell committed these offenses.

The court found that no danger of confusion existed. The cases involved clearly identifiable victims and essentially the same conduct, making them not at all complicated. *Commonwealth v. Boyle*, 733 A.2d 633, 637 (Pa. Super. 1999). The court saw no danger whatsoever of the jury not being able to distinguish each of the incidents. See *Commonwealth v. Janda*, 14 A.3d 147 (Pa. Super. 2011).

The court also weighed "the possibility of prejudice and injustice caused by the consolidation against the consideration of judicial economy." *Janda*, 14 A.3d at 155-156, quoting *Commonwealth v. Morris*, 493 Pa. 164, 171, 425 A.2d 715, 718 (1981). This prejudice exists "if the evidence [tends] to convict [the defendant] only by showing a propensity to commit crime, or because the jury was incapable of separating the evidence or could not avoid cumulating the evidence." *Boyle*, 733 A.2d at 637.

The court found that the possibility of prejudice did not outweigh the judicial economy of consolidating these cases. McDowell was not convicted due to the sheer number

26

of offenses. He was convicted due to the evidence against him, which included but was not limited to incriminating items being found in the vehicle he was driving and in his residence, his use of some of the victim's credit cards, images of him captured on surveillance videos, descriptions and identifications of him by the victims, and his own statements and admissions. In light of the evidence against him and the similarities of the crimes that showed a common plan or scheme and the identity of the perpetrator, it made no sense whatsoever to hold seven separate trials, which would have been an inconvenience to the victims and witnesses, as well as a waste of resources.

McDowell next asserts that the court erred when it denied his motion to dismiss pursuant to Pa. R. Crim. P. 600, as more than three-hundred and sixty-five days had passed since the filing of the charges against him and the date of his January 1, 2016 motion for dismissal.

Rule 600 states, in relevant part:

> (A) Commencement of Trial; Time for Trial
> \*\*\*
>
>  (2) Trial shall commence within the following time periods.
> (a) Trial in a court case in which a written complaint is filed against the defendant shall commence within 365 days from the date on which the complaint is filed.
> \*\*\*
>
> (B) Pretrial Incarceration
> Except in cases in which the defendant is not entitled to release on bail as provided by law, no defendant shall be held in pretrial incarceration in excess of
> (1)  180 days from the date on which the complaint is filed;
> \*\*\*
>
> (C) Computation of Time
> (1)  For purposes of paragraph (A), periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of the time within which trial must commence. Any other periods of delay

27

shall be excluded from the computation.

(2) For purposes of paragraph (B), only periods of delay caused by the defendant shall be excluded from the length of time of any pretrial incarceration. Any other periods of delay shall be included in the computation.

(3)(a) When a judge or issuing authority grants or denies a continuance:

(i) the issuing authority shall record the identity of the party requesting the continuance and the reasons for granting or denying the continuance; and

(ii) the judge shall record the identity of the party requesting the continuance and the reasons for granting or denying the continuance. The judge also shall record to which party the period of delay caused by the continuance shall be attributed, and whether the time will be included in or excluded from the computation of the time within which trial must commence in accordance with this rule.

(b) The determination of the judge or issuing authority is subject to review as provided in paragraph (D)(3).

(D) Remedies

(1) When a defendant has not been brought to trial within the time periods set forth in paragraph (A), at any time before trial, the defendant's attorney, or the defendant if unrepresented, may file a written motion requesting that the charges be dismissed with prejudice on the ground that this rule has been violated. A copy of the motion shall be served on the attorney for the Commonwealth concurrently with filing. The judge shall conduct a hearing on the motion.

(2) Except in cases in which the defendant is not entitled to release on bail as provided by law, when a defendant is held in pretrial incarceration beyond the time set forth in paragraph (B), at any time before trial, the defendant's attorney, or the defendant if unrepresented, may file a written motion requesting that the defendant be released immediately on nominal bail subject to any nonmonetary conditions of bail imposed by the court as permitted by law. A copy of the motion shall be served on the attorney for the Commonwealth concurrently with filing. The judge shall conduct a hearing on the motion.

(3) Any requests for review of the determination in paragraph (C)(3) shall be raised in a motion or answer filed pursuant to paragraph (D)(1) or paragraph (D)(2).

Pa.R.Crim.P. 600.

At a Rule 600 hearing, the Commonwealth bears the burden to demonstrate,

28

by a preponderance of the evidence, that the defendant was tried within the prescribed time period or that the Commonwealth exercised due diligence and the delay was beyond the Commonwealth's control. *Commonwealth v. Bradford*, 616 Pa. 122, 46 A.3d 693, 701 (Pa. 2012); *Commonwealth v. Thompson*, 93 A.3d 478, 488 (Pa. Super. 2014). "[D]ue diligence is fact-specific, to be determined case-by-case; it does not require perfect vigilance or punctilious care, but merely a showing the Commonwealth has put forth a reasonable effort." *Bradford*, 46 A.3d at 701-702.

As Rule 600(C)(1) makes clear, the only time that is included for purposes of a motion to dismiss the charges is when the proceedings have been delayed because of a lack of due diligence by the Commonwealth; all other periods of delay are excluded.

With this standard in mind, the court found that 365 days had not passed and, therefore, McDowell was not entitled to dismissal. Although there was a significant amount of delay in this case, very little of the delay was caused by the Commonwealth's lack of due diligence.

There were 295 days of delay from February 19, 2013 through December 11, 2013, which were not caused by the Commonwealth's lack of diligence.

On February 19, 2013, an order was entered at the request of defense counsel and without objection from the Commonwealth, continuing the status conference to April 5, 2013 and the pretrial conference to May 7, 2013.

On April 5, 2013, another order was entered upon the request of the defense and without objection from the Commonwealth, continuing the status conference from April 5, 2013 to May 31, 2013 and continuing the pretrial from May 7, 2013 to August 13, 2013.

29

However, a case cannot be tried at a status or pretrial conference. August 27, 2013 was the call of the list and first day of jury selection for the trial term associated with those status and pretrial conference dates.

On August 27, 2013, upon request of the defense and without objection by the Commonwealth, an order was entered continuing these matters to September 16, 2013.

On August 19, 2013, the Commonwealth filed a motion to consolidate cases 17-2013, 35-2013 and 63-2013. A hearing and argument on the motion was scheduled for September 16, 2013.

On September 16, 2013, upon request of the defense and without objection by the Commonwealth, an order was entered continuing these matters to October 11, 2013.

On October 11, 2013, the court granted a defense motion to continue the hearing on the Commonwealth's motion to consolidate. The order noted that the Commonwealth had recently provided a global offer to defense counsel and he needed time to discuss the offer and perhaps renegotiate the terms. Defense counsel also requested additional time to discuss the consolidation motion with his client. The court indicated that it would reschedule the consolidation motion on the request of either the Commonwealth or defense. On November 25, 2013, the Commonwealth made such a request and the motion was argued on December 11, 2013. In an opinion and order entered on January 8, 2014, the court granted the Commonwealth's motion to consolidate.

McDowell contended that this time period was not excludable because Mr. Cronin never filed a petition for writ of habeas corpus, never discussed any waiver with him and he did not authorize or expressly waive Rule 600 for this time period.

30

McDowell's argument was based on a faulty premise that counsel cannot validly obtain continuances and waivers of his Rule 600 rights. To the contrary, counsel can request continuances on behalf of a defendant, and the defendant is bound by the actions of his counsel. See *Commonwealth v. Wells*, 513 Pa. 463, 521 A.2d 1388, 1391 (1987)("trial counsel may, at times, be in a position to make strategic or tactical decisions for his client concerning the start of trial. While such decisions may implicate the requirements of Rule 1100, we see no reason why counsel cannot exercise his discretion, weigh the alternatives available, and make an intentional informed choice for his client. The actions of counsel in this regard are imputed to the defendant who is bound thereby."); *Commonwealth v. Walley*, 396 A.2d 1280, 1283 (Pa. Super. 1978)("We have inferentially held that counsel may request continuances that postpone trial commencement…without the specific signed consent of his client. …Continuances are a matter of trial strategy within the reasonable purview of counsel. To hold that counsel cannot unilaterally request continuances that delay the start of trial past the Rule 1100 limit would severely hamper his ability to effectuate trial strategy.").[2]

The next period of excludable delay was the 191 days from March 19, 2014 to September 26, 2014.

On March 19, 2014, the Commonwealth requested a continuance from the April/May trial term, because there were not enough consecutive days to hold the trial due to the lack of availability of all the officers involved. Defense counsel was not opposed to the continuance request. The case was continued to a pretrial conference on May 7, 2014. The order noted that it included excludable time against Defendant from March 18, 2014 to June

---

[2] Rule 1100 was renumbered Rule 600, effective April 1, 2001.

31

20, 2014, end of term.

On May 9, 2014, the Commonwealth requested a continuance from the May/June trial term, because there were not enough consecutive days to hold the trial due to the lack of availability of all the officers involved. Defense counsel was not opposed to the continuance request. The case was continued to a pretrial conference on August 12, 2014. The order noted that it included excludable time against Defendant from May 6, 2014 to September 26, 2014, end of term.

The court noted that the orders specifically stated that these periods of time were excludable. Pursuant to Rule 600(D)(3) if McDowell wished to challenge these determinations, he needed to specifically do so in his Rule 600 motion. He did not; therefore, he waived any claim that these periods were not excludable.

Furthermore, the Pennsylvania appellate courts have held that when a defendant or his counsel agrees or is not opposed to a continuance motion or request made by the Commonwealth, such is construed "as consent to the new date and waiver of any Rule 600 claim arising from that postponement." *Commonwealth v. Hunt*, 858 A.2d 1234, 1241 (Pa. Super. 2004).

The time from May 27, 2014 to August 12, 2014 also was excludable because McDowell wished to fire his counsel and represent himself. On May 27, 2014, McDowell filed a "Pro Se Motion to both Relieve Public Defender and Appoint New Defense Counsel." This motion was followed by a July 11, 2014 document which the court construed as a "Waiver of Appointed Counsel." In the waiver document, McDowell requested that he be permitted to defend the charges against him pro se with the assistance of "a counselor as an

32

advisor only." Following a hearing on August 12, 2014, which included an extensive colloquy of McDowell, the court permitted McDowell to proceed pro se, but appointed Robert Cronin, Esquire of the Lycoming County Public Defender's office, as standby counsel.

The next period of excludable delay is the 402 days from September 26, 2014 through November 2, 2015.[3] McDowell conceded that delay attributable to his omnibus pretrial motions was excludable time. On August 26, 2014, McDowell filed a pro se omnibus pretrial motion. In a letter, he requested time to file additional motions. On September 9, 2014, an order was entered which granted that request and directed that any such motion must be filed on or before October 12, 2014.

On October 9, 2014, McDowell filed an extensive amended omnibus pretrial motion. Hearings were held in connection with McDowell's omnibus motions on November 17, 2014; December 30, 2014; February 6, 2014; March 18, 2014; March 25, 2014; May 4, 2015; and July 8, 2015. Then McDowell wanted the opportunity to brief the issues in his omnibus pretrial motions. His brief was originally due August 31, 2015, but that deadline was extended to October 5, 2015, at his request. In an opinion and order entered on November 2, 2015, the court denied McDowell's omnibus pretrial motions.

The court also found that the 89 days from December 16, 2015 to March 14, 2016 was excludable for dismissal purposes. The Commonwealth requested a continuance because one of the police witnesses (Corporal Fusco) and two of the victims (Ms. Campbell

---

[3] The time attributable to Defendant's omnibus pretrial motions began with the filing of his first motion on August 26, 2014. However, as the court already found excludable time to September 26, 2014, the court began calculating the time from September 26, 2014 so that it did not "double count" the time from August 26 to September 26, 2014.

33

and Ms. Economu) were unavailable for trial. On December 16, 2015, over McDowell's objection, the court granted the Commonwealth's motion to continue jury selection. McDowell's cases were scheduled for jury selection between February 16-18, 2016 and the March 2016 trial term. In the order, the court specifically noted this time shall not run against the Commonwealth for Rule 600 dismissal purposes, but would run against the Commonwealth for nominal bail purposes. The unavailability of these witnesses was not within the control of the Commonwealth and occurred despite the Commonwealth's diligence. Therefore, this time could not be included in the Rule 600 computation for dismissal purposes. See *Commonwealth v. Hyland*, 875 A.2d 1175, 1191-1192 (Pa. Super. 2005)(witness's unavailability due to deployment to the Middle East was beyond the Commonwealth's control; therefore, the Commonwealth could not be held to be acting without due diligence); *Commonwealth v. Hunt*, 858 A.2d 1234, 1241 (Pa. Super. 2004)(delay which occurs as a result of circumstances beyond the Commonwealth's control and despite its due diligence is excusable).

The court also noted that regardless of the Commonwealth's continuance, the period of time (67 days) from January 7, 2016 to March 14, 2016 was excludable due to McDowell's Rule 600 motion.

There were a total of 1,113 days from the filing on December 20, 2012 of the first criminal complaint in CR-17-2013 to the filing of McDowell's Rule 600 motion on January 7, 2016. When the 295 days from February 19, 2013 to December 4, 2015, the 191 days from March 19, 2014 to September 26, 2014, the 402 days from September 26, 2014 to November 2, 2015 and the 22 days from December 16, 2015 to January 7, 2016 are excluded,

34

there are only 203 days of non-excludable time from the filing of the complaint in case 17-2013 to the date of McDowell's Rule 600 motion. The other cases were filed after case 17-2013. Therefore, McDowell was not entitled to dismissal of any of the charges filed against him.

The final allegation is that the court erred and abused its discretion when it sentenced McDowell to multiple consecutive sentences for an aggregate sentence of 26 to 64 years of incarceration, as this created an unduly harsh and manifestly excessive sentence without consideration of his age and rehabilitative needs.

"Imposition of a sentence is vested in the discretion of the sentencing court and will not be disturbed absent a manifest abuse of discretion." *Commonwealth v. Smith*, 543 Pa. 566, 673 A.2d 893, 895 (1996). An abuse of discretion is more than a mere error in judgment; it will only be found when the record discloses that the judgment exercised by the trial court was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. Id.

In imposing a sentence, a court shall follow "the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S.A. §9721(b).

In his post sentence motion, McDowell asserted that his sentence was unduly harsh and manifestly excessive given the nature of the crimes for which he was convicted and his age. He also alleged that the court abused its discretion when it stated that he had no rehabilitative qualities. McDowell noted that the average life expectancy for a black male

35

was 71.8 years and he would not be eligible for parole until he was 86 years old. He claimed that the risk for recidivism falls as one begins to age and argued that by the time he is 70 his risk for recidivism would be quite low and he would no longer pose a danger to the public. He also contended that his sentence was a de facto death sentence, as he will not be eligible for parole until 15 years past his average life expectancy.

The nature of the crimes justified a minimum sentence of more than the 10 years that McDowell sought. McDowell committed multiple serious crimes such as burglary and robbery, in addition to thefts and access device fraud. There were six separate victims, all of whom were octogenarians. Other than small children, the court can think of no members of our society who are more vulnerable than women in their eighties who are out alone grocery shopping. Food is one of life's necessities. These women could not simply avoid the danger McDowell presented by not going to the grocery store. Furthermore, for at least three of the victims, the crimes were significantly more than just thefts. McDowell did not simply snatch a few purses. McDowell followed two of the victims to their residence and invaded the sanctity of their homes, and he had a physical altercation with a third victim at her vehicle. The court can only imagine the terror that these women felt at the time of the crime, and the anxiety and the concern about their personal safety that they must have felt thereafter. Unfortunately, by the time McDowell was convicted and sentenced for these crimes, two of his victims had passed away. In fact, given McDowell's admissions to the police, the court ultimately came to believe that McDowell intentionally delayed the proceedings hoping that the victims would not be able to testify against him.

This also was not McDowell's "first rodeo" so to speak. McDowell had a

36

history of committing robberies and thefts that spanned decades. His prior record score was a five. He had been in and out of prison most of his adult life. Nothing was effective in keeping McDowell from resorting back to a life of crime, not even his job in the hydrofracking industry which brought him to Lycoming County.

The court had the discretion to impose concurrent or consecutive sentences. 42 Pa.C.S.A. §9721(a); *Commonwealth v. Prisk*, 13 A.3d 526, 533 (Pa. Super. 2011). The court found that consecutive sentences were appropriate in these cases. In essence, McDowell was seeking a volume discount for his crimes due to his age and rehabilitative needs. The court found that he was not entitled to a volume discount. See *Commonwealth v. Petterson*, 49 A.3d 903, 912 (Pa. Super. 2012). At the time of sentencing, McDowell was 59 years old. His victims were in their 80s. They didn't receive better treatment due to their age. In fact, according to McDowell's statement in the pre-sentence investigation, it appears that he chose them as victims due to their age and the likelihood that they would not fight back.

McDowell also contended that the court erred in finding that he had no rehabilitative qualities. The court disagreed. Given McDowell's history of crimes, incarceration and parole revocations, it was apparent to the court that McDowell had numerous opportunities to rehabilitate himself in the past, which either were squandered or failed miserably. There was nothing to indicate that this time would be any different. In fact, his conduct while incarcerated pending trial indicated that his behavior had not improved.

Under the facts and circumstances of this case, McDowell did not deserve any special consideration due to his age and rehabilitative needs. The court considered

37

McDowell's rehabilitative needs, but found that the protection of the public, especially

elderly women, from his criminal behaviors was paramount in this case.


DATE: 5-8-17                                    By The Court,


                                                _____
                                                Marc F. Lovecchio, Judge


cc:     Melissa Kalaus, Esquire (ADA)
        Joshua Bower, Esquire (APD)
        Work file
        Gary Weber, Esquire (Lycoming Reporter)
        Superior Court (original & 1)